FRONTIER THEATRES INC., Appellant,

v.

Paul Bruce BROWN et ux., Appellees.

No. 5544.

Court of Civil Appeals of Texas.

El Paso.

Oct. 3, 1962.

Rehearing Denied Nov. 28, 1962.

Richard L. Toll, Russell & Tomlin, Pecos, for appellant.

Richard D. Naylor, John P. Dennison, Pecos, for appellees.

LANGDON, Chief Justice.

On May 11, 1958 fire destroyed a drive-in theatre owned by appellant, Frontier Theatres, Inc., located near the City of Pecos, in Reeves County, Texas. Certain household furnishings, clothing, money, jewelry and other personal property belonging to an employee of appellant (Mrs. Blanche Elizabeth Brown), not used by her in the employment, were lost or destroyed in the fire. Mrs. Brown and her husband brought suit in the District Court of Reeves County against appellant for damages sustained by reason of the loss of her personal property.

The cause came on for trial before the court and a jury, but by agreement of the parties the jury was dismissed and the case tried to the court. From a judgment in favor of Mrs. Brown and her husband, fixing liability against appellant and awarding damages to the appellees in the sum of $21,-253.00, together with interest thereon from the date of loss, appellant has prosecuted this appeal.

The judgment entered by the court below allowed recovery for *all* the property allegedly lost by appellees in the fire. In addition to the damages allowed for the customary household furnishings, clothing and personal effects ordinarily possessed by families for their personal use and convenience at home, the trial court allowed recovery for the loss of $828.00 in cash and $10,121.08 for the loss of certain "irreplaceable goods and chattels", among which

(with the values thereof as found by the court) were the following: A coin collection, $666.66; two slumber spreads, $666.66; one wedding veil, shoes and point lace collar, $666.66; one key-wound heirloom watch, $666.66; a deed signed by U. S. Grant, $166.66; one emerald ring, $733.33, and $200.00 for the loss of another such ring; one 36-cal. Colt and holster, $500.00; one English letter box, $233.33; one cameo pin, $333.33, together with many other presumably rare and valuable items.

This case is unique because it is a suit by an employee arising out of an accident on the employer's premises, in which the employee seeks to recover damages from her employer, not for any personal injury, but solely for the accidental loss of personal property belonging to such employee, not used in the master's business, destroyed as the result of a fire on the master's premises.

While it would seem that such loss by an employee would not be an infrequent occurrence, we have been unable to find any Texas cases involving a comparable fact situation, nor have we been able to find a case from any other jurisdiction precisely in point.

Obviously, since no personal injuries are involved in this litigation, appellant's liability, if any, to appellees, solely for loss of personal property, cannot be based upon the Workmen's Compensation laws of this state, and we are unaware of the existence of any other statutory authority under which liability might be imposed here. Consequently, we have concluded that if the trial court's judgment, decreeing appellant liable to appellees, is to be affirmed it must be upon rules and principles applicable at common law.

The record in this case is voluminous (357 pages). It reflects that appellant is a corporation doing business in Texas with its office and principal place of business located at Dallas. It owns and operates a number of theatres in Texas and New Mexico and was the owner of the Eagle Drive-In Theatre near Pecos at the time of its destruction

by fire on May 11, 1958. Mr. Floyd H. Scott, of Richardson, Texas, testified that he was one of appellant's district managers; that the company owned three theatres in Pecos, including the Eagle Drive-In; that these theatres were within the district over which he had general supervision. He stated that it was a policy of the company in any city or town where it had more than one theatre to employ a local or city manager as its agent or contact in such city; that Mr. Russell Ackley was appellant's local manager in Pecos at the time in question, and that he in turn had authority to hire such personnel as was required to operate the theatres, including the authority to hire managers for each of the three theatres.

It is undisputed that some time prior to August of 1957 appellant's local manager, Mr. Russell Ackley, employed Mrs. Brown and two of her minor sons, Larry Paul Brown and Roger Dale Brown, to work for appellant at its Eagle Drive-In Theatre near Pecos. She was placed on the payroll on August 24, 1957 but, according to Mrs. Brown's own testimony, she had spent most of the preceding month of July and the early part of August on appellant's premises at the drive-in, presumably to familiarize herself with the premises and the work she was to perform. On August 24, 1957 Mrs. Brown, together with her two minor sons, commenced their employment with appellant. They moved into and occupied an apartment located on the premises, bringing with them a trailer-house and many other personal possessions. Part of these personal possessions were placed by plaintiff in the apartment, and others were left in the trailer-house. Mrs. Brown placed the house trailer at the place it was located at the time of the fire, and connected—or caused it to be connected—to appellant's butane gas system. Some time thereafter Mrs. Brown also brought other personal property on the premises, including a two-wheel trailer and a truck (not otherwise described), both of which contained a number of other personal items belonging to Mrs. Brown and her family. The two vehicles (truck and two-wheel trailer) were brought upon appellant's premises and placed where they were at the time of the fire without express authority from Mr. Ackley, but without any objection on his part.

In addition to Mrs. Brown and her two sons, the Brown family consisted of Mrs. Brown's husband (a disabled oil-field driller), and a minor daughter, Judy. Other members of the family were grown or married and did not live on the premises; consequently, they are not directly involved in this litigation. Mrs. Brown's husband, although a necessary party, was not an employee of appellant. Therefore neither he nor Judy (the Brown's minor daughter) is otherwise connected with this suit.

The apartment with which we are concerned here formed the base of appellant's theatre screen. The entire structure is referred to in the record as the "tower structure". In its findings of fact the trial court found that "such tower structure was of a total height of approximately 60 feet, the lower 8 or 8½ feet of which contained an apartment for residential purposes. The upper 51½ or 52 feet of such structure was so constructed as to afford a theatre screen on the inside portion thereof and a large neon sign on the exterior thereof". The trial court also found that the fire in question was caused by and resulted from defects in the electrical wiring connected to the neon sign in that portion of the tower structure located above the apartment occupied by appellees.

The record reflects that the contract of employment under which Mrs. Brown and her two sons commenced their employment with appellant was negotiated entirely by Mrs. Brown. Larry Brown, the older of the two boys, had previously worked for appellant at its theatres in Crane, Texas for a period of two and a half years, as a motion picture projectionist, and was engaged in this work at appellant's Eagle Drive-In on the night of the fire in question. The other son, Roger Dale Brown, was the

marquee boy (a job involving the lettering of signs advertising current and coming attractions on the marquee); he also assisted in the collection of tickets at the gate and worked in the snack bar during intermissions. The nature of Mrs. Brown's employment is susceptible of being determined by her own testimony given in a deposition on January 9, 1959, more than two years before the trial of this cause. The deposition is in evidence, having been offered by appellees themselves, without limitation or restriction. Concerning her contract negotiations with Mr. Ackley (appellant's local manager) and the job requirements, Mrs. Brown's testimony was as follows:

"Q You say he (Mr. Ackley) employed you as manager because he had no one to take charge out there. What is a manager?

"A Well you have to take complete charge out there. I was under his supervision. He was my supervisor above me. Anything that I needed, I was allowed a certain amount to run on, of course, I had to take care of the books out there.

"Q Did you have charge of the concession stand?

"A Yes, sir.

"Q Did you have charge of cleaning up the place?

"A No, we had a janitor out there.

"Q Were you supposed to see that he cleaned it up?

"A Yes, sir.

"Q That would include all the property out there?

"A Yes, sir.

"Q In other words, you were in charge of the entire set-up out there?

"A Yes, sir.

"Q And if anything went wrong with it, you were supposed to report it to Mr. Ackley?

"A . Yes, sir."

At the trial Mrs. Brown testified that she was given the "title" of manager but that she felt that she was a manager in name only, because there was an "undercurrent" or feeling on her part that someone else was always checking on her. She also testified that she merely reported to Mr. Ackley what was needed in the way of supplies or repairs, and that he was the one who ordered the supplies and repair work whenever they were needed. She stated that she had nothing to do with the hiring or firing of personnel; that Mr. Ackley did all of the hiring and firing of employees.

It is undisputed that at the time of the fire in question Mrs. Brown and her family had lived on the premises for approximately ten months. If her own testimony is true, she unquestionably had access (in her capacity as an employee) to every nook and cranny of the drive-in theatre. She not only had full and complete access to the entire premises, but was charged with the responsibility of looking after such premises and reporting any defects she might observe therein, or in the fixtures and equipment thereon, to her immediate superior, Mr. Ackley. According to her own testimony Mrs. Brown discovered, a week or ten days before the fire, that something was wrong with the electrical wiring or apparatus in the neon sign in the upper portion of the tower structure. She testified that she observed sparks running up the side of the building from the neon sign; that she pulled the switch and the sparks immediately stopped. Thereafter she reported the matter to Mr. Ackley, who told her to leave the sign turned off, and that he would report the trouble. A day or two later an electrician came out to the drive-in, replaced one or two of the transformers inside the tower, and took away some of the neon tubing for further repairs to be made in his shop. Mrs. Brown called the

electrician's attention to a bird's nest somewhere in the tower, and he returned the next morning at Mrs. Brown's request to remove the nest. Before leaving the premises the electrician told Mrs. Brown that he had removed some of the neon tubing for repairs; that it would take perhaps two weeks to make the necessary repairs at the shop, but that in the mean-time the sign could be safely operated. When the sign was turned on the following evening, Mrs. Brown again observed sparks in approximately the same area in which she had previously seen them, and reported the matter to Mr. Ackley; later, on Saturday of the same week, she again mentioned it to Mr. Ackley during the course of one of their regular weekly meetings, because she "just didn't feel that things were right".

The fire occurred on May 11, 1958 (a Sunday) before all repairs to be made were completed, and it is not entirely clear from the record whether Mrs. Brown's last conversation with Mr. Ackley regarding the defect in the sign was on the Saturday immediately preceding the fire on Sunday, or whether it was seven days earlier. In any event there can be no question but that Mrs. Brown was, at all pertinent times, fully aware of the existence of a defect in the electrical wiring or apparatus in the neon sign, and was apprehensive about it. The record also reflects, and the court so found, that both Mrs. Brown and her husband had full knowledge at the time of the commencement of the above-mentioned employment agreement with appellant, and at all times thereafter, of the facilities existing at the appellant's premises for fighting fires, and at all such times had full knowledge of the fact that there was no water system available at such premises to combat fires. Further, the trial court found that the switch controlling the neon sign on the tower structure was located at a place accessible to Mrs. Brown; that she knew the correct method of turning said sign on and off, and cutting off the electrical current supplying said sign as well as all other electrical current used at said drive-in theatre.

The theory relied upon by appellees, for the purpose of establishing the liability of appellant for the loss of appellees' personal property, is based primarily upon the contention that a master-servant relationship existed between appellant and appellees at all pertinent times. In this connection they alleged that appellant was negligent, (1), in failing to discontinue the operation of the drive-in theatre until proper and adequate repairs had been made to the electrical wiring in the tower building, after notice of a defect therein had been transmitted by appellees to appellant; (2), in failing to inspect the electrical wiring in the structure for the purpose of determining whether or not the same could be used without danger of fire; (3), in failing to equip the theatre tower and living quarters therein with adequate fire extinguishing equipment to enable appellees to combat any such fire; and (4), in failing to furnish appellees with a safe place in which to work and a safe place in which to live while performing the services agreed upon in their contract of employment. Appellees also relied upon the theory that, in the event the trial court should find that a landlord-tenant relationship existed between appellant and appellees because of appellees' occupancy of part of the premises (the lower portion of the tower structure) for residential purposes, appellant would nevertheless still be liable to appellees because appellant had retained the exclusive management and control of the upper portion of the tower structure where the fire in question originated, and as a landlord was under duty to maintain and operate such upper portion in a reasonably safe and prudent manner so as to prevent damage to plaintiffs' property located in the lower portion of such structure and used by them for residential purposes.

By way of defense appellant specially pleaded assumed risk and contributory negligence.

Lengthy findings of fact and conclusions of law, too numerous to set out in full herein, were made by the trial court. On the issues of negligence, the trial court made the following findings:

"15. The Defendant's failure to repair the electrical defects after knowledge of their existence, was negligence and such negligence was a proximate cause of the fire in question.

"16. The Defendant's failure to provide and maintain adequate fire fighting equipment and facilities under the existing conditions was negligence, and such negligence was a proximate cause of the fire in question.

"17. The Defendant failed to furnish Plaintiffs a safe place in which to work and to live while such work was being performed, which failure was negligence and such negligence was a proximate cause of the fire in question.

"18. The defective electrical wiring and apparatus causing the fire in question was an instrumentality in the exclusive management and control of the Defendant; that there was an entire absence of conduct on the part of the Plaintiff contributing to the fire in question; and that the fire in question would not ordinarily have occurred, but for some negligent act or omission on the part of said Defendant, or if due care had been exercised."

■ Regardless of whether the liability of the appellant (found by the trial court to exist here) is based upon a master-servant, landlord-tenant or some other relationship, where it is contended that the plaintiff sustained an injury (either to person or property) as a result of the defendant's conduct, it is elementary that it must be shown that the defendant owed a legal duty of some character to the plaintiff with respect to such injury, and that defendant violated such duty. (See "Of Torts and Defendants", by Rassman, 16 Southwestern Law Journal 244, and cases cited).

Appellant has based its appeal upon seventeen points of error, the first six of which relate in one way or another to the question of whether appellant incurred any liability to appellees by reason of the fire.

By Point One it is contended that the trial court erred in rendering any judgment against appellant for damages to appellees' property because the undisputed evidence shows that appellant did not breach any legal duty which it owed to appellees in connection with the hazards causing or contributing to cause the destruction of appellees' property by fire; Point Two, that appellees, in their positions as manager of appellant's theatre, and tenants of appellant, were as well or better situated than appellant to foresee and prevent the injury and damage to their personal property, and were therefore contributorily negligent as a matter of law; Point Three—appellees had full notice and knowledge of the condition of the theatre premises and of the facilities for turning off the neon sign, as well as the facilities for fighting fires, long prior to the occurrence of the fire, and therefore assumed the risk of any damage or injury that might occur by reason of such condition; Point Four—appellees were contributorily negligent as a matter of law because, under the undisputed testimony of Mrs. Brown, she had seen and observed the defect in the neon sign prior to the fire and was conscious of a danger of fire from the defective wiring in the neon sign; and failed to use the means at hand, of which she had full knowledge, to turn off said sign and thereby prevent the occurrence of such fire; Point Five—appellant was under no duty to provide fire-fighting equipment to said premises; appellees took possession of the premises and used and occupied the same with full notice and knowledge of the absence of any such fire-fighting equipment;

therefore, the trial court's Finding of Fact (No. 16, supra) that appellant failed to furnish adequate fire-fighting equipment, is insufficient to form the basis of any judgment against appellant; and, Point Six— the trial court's Finding of Fact No. 17 (quoted above) is insufficient, as a matter of law, to support such judgment.

If we have correctly construed the trial court's Findings of Fact Nos. 15, 16, 17 and 18, set out above, the liability of appellant, as determined by the court, is based upon two alleged breaches of duty, one being the failure of appellant to absolutely protect appellees against the danger of a fire caused by an alleged defect in the electrical wiring, with respect to which both the appellant and the appellees were fully aware; and the other, breach by appellant of an alleged duty to provide adequate equipment or facilities at the premises to combat any fire that might occur from any cause.

There is sufficient evidence to have supported a finding that appellees occupied the tower apartment and the site for their trailer and other personal property, located and placed by them immediately adjacent to the tower structure, for residential purposes and that a landlord-tenant relationship was created by virtue of the fact that appellees paid a specified monthly sum of money to appellant by check in connection with their use of such premises for residential purposes. In each instance Mrs. Brown indicated on the face of such checks that they were for "rent". In order to dispose of the question we will assume (without so holding) that appellees' occupancy of appellant's premises at the time of the fire was based upon a landlord-tenant relationship, and that they were not required to occupy and live on such premises as a part of their employment.

■ Texas has no statutory provisions respecting the obligation of a landlord to repair the premises, and affixing liability for failure to repair. In the absence of such a statute, or a specific agreement on the part of the landlord to keep the premises in re-pair, the tenant takes the premises in the condition he finds them, and the landlord may be held liable in damages to his tenant by reason of some defect in the premises where such defect is hidden, but only if the landlord knew of the existence of the hidden defect and failed to disclose it to his tenant. Where the tenant has actual knowledge of the hidden defect, the landlord is under no duty to disclose it. Flynn v. Pan American Hotel Co., 143 Tex. 219, 183 S.W.2d 446; Churchwell et ux. v. Pure Oil Pipe Line Co., Tex.Civ.App., 289 S.W. 196.

■ While it is true, under the facts of this case as found by the court, appellees occupied only the lower portion of the tower structure for residential purposes and that the upper 51 or 52 feet of such structure, including the screen, neon sign and all electrical apparatus pertaining thereto, was not a part of such apartment, but was reserved by and under the exclusive control of appellant, we are nevertheless of the opinion that such facts are not sufficient to impose liability upon this appellant based upon a landlord-tenant relationship where it is shown that the tenants (appellees) were fully aware of the defect in the upper portion of the structure and were themselves, as agents and employees of the corporate owner of the premises, in actual physical possession of the entire drive-in theatre with complete and unrestricted access to every part thereof. As said in United East & West Oil Company v. Dyer, 139 Tex. 318, 162 S.W.2d 680, "A person may occupy premises as a tenant and yet be a servant of the owner * *." The nature of a corporation is such that it can exercise possession and control only through its agents and employees. Appellees, if we assume they were tenants of appellant, occupied appellant's premises in a dual capacity, and it is immaterial that they rented or used only a portion of such premises for residential purposes, where the balance of the premises was also under their control by virtue of their employment. We believe they had the same access, possession and control over the appellant's premises as they would have had if they had rented

all of such premises. In such case the law in Texas with respect to the liability of landlord to a tenant is quite well settled. Generally the cases hold that in order for a Texas court to affix liability upon a landlord for injury to a tenant, there must exist some type of contract or agreement between the landlord and the tenant imposing a duty upon the landlord to keep the premises in repair, or a covenant to keep the premises in a reasonably safe condition. We hold, therefore, that appellant owed no duty to appellees based on the theory of a landlord-tenant relationship under the facts of this case. Consequently, appellant may not be held liable to appellees on such theory.

This brings us to a discussion of appellees' primary theory of recovery based upon a master-servant relationship.

As in other cases of negligence, the master's liability to a servant must be based upon the breach of some legal duty. He is not an absolute insurer of the safety of either the servant's person or property, even with respect to deficient or defective instrumentalities for the work.

The three elements of actionable negligence—a legal duty owed by one person to another; a breach of that duty; and damage proximately resulting from such breach—must exist before there can be any recovery. The duty need not be one imposed by contract between the parties, but may be one implied by law from the circumstances and relationship of the parties. Toward a stranger or trespasser, the owner of premises owes a lesser duty than toward one whom he has invited upon them, and the duty which a carrier owes to its passengers for hire is greater still. It is considered that a servant, when upon his master's premises in the course of his employment, occupies the position of an invited person and therefore is entitled to warning and protection against all the dangers which the master knows and which the servant does not know and appreciate.

There is no evidence in this record to show that the defective condition in the electrical wiring on appellant's premises existed at any time prior to a week or ten days before the fire. The appellee, Mrs. Brown, discovered the defect herself when she observed sparks running up the side of the tower structure, and it was she who reported the matter to Mr. Ackley. Mr. Ackley, in turn, reported the condition to the electrical firm that made the original installation, and repairs were immediately commenced, part of which were to be made in the electric company's own shop, and would require approximately two weeks to complete. The fire occurred before all contemplated repairs were completed.

According to the testimony of Mrs. Brown's son, Larry Paul Brown (who at the time of the fire was working at the drive-in as a projectionist), he also had observed the sparks from the sign a week or more prior to the fire; he testified that his mother had reported the matter to Mr. Ackley, and that a man arrived to make repairs about two days after the sparks had first been observed by him; that his mother had questioned the repairman as to the possibility of a fire due to the neon and asked him if it was safe to operate after he had worked on it. The man told the witness' mother that he had never heard of a case of fire caused by neon, and that it would be safe to operate. After the man left, sparks were again observed when the sign was turned on at night. Larry Paul testified that the sign was controlled by several different circuits and that he had made tests and discovered that the sparks ceased when certain switches were turned off.

In his original Findings of Fact the trial court made the following finding:

"4. Under the terms of the employment agreement, it was agreed that the Brown family would live on the theatre grounds on a 24 hour a day basis and that such family would serve as caretakers of Defendant's property to deter vandalism and to report to Defendant's city manager repairs of any nature that were needed, as well as

other pertinent information concerning such property."

In response to appellant's request, the trial court made the following additional findings:

"7.

"I find that the plaintiff, Blanche Elizabeth Brown and her husband, James Perry Brown, had full knowledge, at the time of the commencement of the above mentioned employment agreement with this Defendant, and at all times thereafter, of the facilities existing at the Defendant's premises for fighting fires, and at all such times had full knowledge of the fact that there was no water system available at such premises to combat fires."

"10.

"I find that the switch controlling the neon sign on the tower structure was located at a place accessible to the Plaintiff, Blanche Elizabeth Brown; that she knew the correct method of turning said sign on and off, and cutting of the electrical current supplying said sign, as well as all other electrical current used at said drive-in theatre."

■ Since we are concerned here with conditions existing on the master's premises which resulted in damages confined solely to chattels belonging to the servant, it is unfortunate that the rules laid down in a vast majority of the cases are stated only in terms of conduct on the part of the master creating risks of bodily harm. The weight of authority seems to favor rules that impose the same duties upon a master toward a servant on the master's premises in the scope of the employment that any other owner or possessor of similar premises owes to an invitee. Generally, servants are treated as business invitees (as distinguished from gratuitous invitees), while on the premises in the scope of their employment. Restatement of the Law of Torts, Sec. 497b (1948 Supp.) ; see also Ch. 13.

In Royal Insurance Company v. Mazzei, 50 Cal.App.2d 549, 123 P.2d 586, it was held : "The duties owed to chattels in the possession of a business invitee are the same as the duties owed to the business invitee personally." In the Mazzei case, suit was against the owner and operator of a cotton gin and yard for damages to thirty bales of cotton which caught fire after being loaded on a truck belonging to Mazzei, a business invitee, when the hoist of the truck came in contact with three electric wires maintained by the gin over a road in the gin yard. The wires were maintained by the owner of the gin at a height of only twelve feet above the road, which was at least eleven inches less than the height of the hoist on Mazzei's truck, as well as all other cotton trucks which used the road for the purpose of moving cotton from the gin premises. The owner of the gin was aware of all these facts, but failed to warn Mazzei. The court absolved the defendant gin owner of liability, holding that the owner of the premises is not an insurer, but owes a duty of ordinary care to see that the premises are reasonably safe and to warn the invitee of any dangers of which he has knowledge and which are not readily apparent to the eye. The owner of the premises, however, is under no such duty where the dangers are obvious or as well known to the invitee as to the owner of the premises, and there is no obligation on the part of the owner of the premises to give warning of an obvious danger or one which should have been perceived by the invitee through ordinary use of his own senses.

■ We believe the rule announced in the Mazzei case with respect to the duties owed by the owner of premises to chattels in possession of a business invitee is too broadly stated for general application. It seems to us that the chattels in possession of the invitee to which the duty is owed should bear some relation to the invitation, and that the owner of premises should not be held accountable for the safety of *all* chattels in the possession of an invitee, particularly where the chattels in question are found to

consist of items not usually found in the possession of the class of invitees to which the plaintiff belongs. Under the facts of the Mazzei case, the chattel was cotton, and it was an item most business invitees on the premises of that particular defendant were likely to have in their possession. In addition, the owner of the premises knew that his invitee had thirty bales of cotton in his possession and knew that the hoist of the truck on which the cotton was being carried was higher than the overhead wires crossing the road on which the truck would travel.

■ The responsibility of common carriers of passengers for the safe transportation of their luggage is, in general, the same as that of carriers in respect to merchandise which they receive for carriage, but the carrier's implied undertaking of safety with respect to a passenger's baggage is not unlimited, and extends only to such kinds and quantity of articles and valuables as are ordinarily taken by travelers for their personal use and convenience, varying according to the station of the party, the object and length of his journey, and many other circumstances. Sutherland on Damages, Vol. 3, Third Ed., Sec. 954, p. 2811.

■ Subject to the limitation that the owner of the premises either knows what chattels the invitee has in his possession, or the chattels are of such nature, quantity and value as would ordinarily be found in the possession of an invitee of the same class under same or similar circumstances, we announce the rule "that the master's duty to chattels (not used in the employment) in possession of a servant on the master's premises in the scope of the employment is the same as the duty that the owner or possessor of similar premises owes to a business invitee against the risk of bodily harm."

■ We have concluded that appellees are barred from any recovery, under the facts of this case, regardless of whether the duties allegedly owed by appellant with respect to the chattels of appellees be found to rest solely upon a master-servant relationship between the parties, or solely upon a landlord-tenant relationship; or, upon a finding that both such relationships existed simultaneously under the employment agreement. We have already discussed our reasons for holding that appellees cannot recover under the theory of the existence of a landlord-tenant relationship.

■ The Workmen's Compensation Act (Art. 8305 et seq., Vernon's Ann.Civ.St. Tex.) has no application here, since the law does not afford a workman the same certainty of protection against injury to his chattels that is afforded such workman under the Act against bodily harm. In such case, where legislation has not abolished the defense of assumed risk, the common law rule still prevails in the master-servant relationship.

In this case the appellees contend that they had to live on the premises on a 24-hour a day basis to look after the appellant's drive-in theatre. It is suggested that they were required to occupy appellant's tower apartment and the site on which they placed their trailer and other personal property, in order to perform the obligations imposed upon them under the terms of the contract of employment. On this point we believe the holding of the Supreme Court of Texas in the case of Robert E. McKee, General Contractor, v. Patterson, 153 Tex. 517, 271 S.W.2d 391, is directly in point.

In the McKee case the court pointed out that while the duty of the landowner is frequently phrased as one "to exercise ordinary care to keep the premises in a reasonably safe condition" so that the invitee will not be injured, such is only a simplified statement of the duty, sufficient to meet the problems presented in particular cases. The court continued as follows:

"There are certain qualifications not there expressed. It is now well established in this state that the duty as

there expressed does not extend to those invitees who know or should know of the existence of the particular condition and who appreciate or should appreciate its dangers. * * * (citing cases). What the qualification means, of course, is that in as much as the invitee has knowledge of the dangers there is no duty on the owner to warn him of them. It means also that if, having knowledge of the dangers, the invitee exposes himself to them he must take the premises as he finds them and there is no duty on the owner to protect him even by the use of reasonable precautions to eliminate the hazards."

█ It is now settled law in Texas that in determining liability under the defense of voluntary exposure to risk, one cannot recover for injures sustained while voluntarily exposing himself (or his property) to a danger which he either does or should fully realize and appreciate. 38 Am.Jur. 845 et seq., Negligence, Secs. 171–173; Levlon v. Dallas Ry. & Terminal Co. (Tex.Civ. App.), 117 S.W.2d 876 (wr. ref.); Wood v. Kane Boiler Works, Inc., 150 Tex. 191, 238 S.W.2d 172; Robert E. McKee, General Contractor, v. Patterson, 153 Tex. 517, 271 S.W.2d 391.

█ Under the facts of this case as found by the trial court, appellees had knowledge of the dangers existing on appellant's premises. The evidence is undisputed that the dangers were open and obvious and the facts show that appellees voluntarily encountered them. We therefore hold that appellant breached no duty it owed to appellees and that appellees are barred, as a matter of law, from any recovery under the facts of this case. Further, we hold that appellees were guilty of contributory negligence, as a matter of law, in failing to remove their property—if not from the premises entirely, at least from the tower apartment and the vicinity of the tower structure—after having discovered the defect in the electrical wiring therein which they knew or should have known

might ignite the structure and destroy their property. Appellees were at all times in as good or better position than appellant to avoid the danger and protect their property. We also hold, as a matter of law, that there was no duty under the undisputed facts of this case requiring appellant to furnish additional fire-fighting facilities for the purpose of combating fire on the premises. We therefore sustain appellant's Points One, Two, Three, Four and Five.

In view of our holdings, we consider it unnecessary to pass upon the question of values found by the trial court to exist with respect to certain "irreplaceable goods and chattels" allegedly destroyed by the fire.

Since our holdings sustaining appellant's first five points is decisive on the question of liability, it makes a discussion of appellant's remaining points unnecessary.

Having held that there was no liability on the part of the appellant, it follows that this case must be reversed and here rendered, and it is so ordered.