George A. CONSTANT et al., Petitioners,

v.

Ward HOWE et ux., Respondents.

No. B–932.

Supreme Court of Texas.

Dec. 31, 1968.

Cullen, Mallette, Maddin, Edwards & Williams, Harry F. Maddin, Victoria; William C. Sparks, Dist. Atty., R. J. Walker, Asst. Dist. Atty., Victoria, for petitioners.

Utter & Chase, Carl C. Chase, Corpus Christi, Ellis & Andrews, Thomas M. Andrews, Aransas Pass, for respondents.

GRIFFIN, Justice.

This is a malpractice and negligence suit filed in the District Court of Victoria County, Texas, by respondents, Ward Howe and wife Estelle, as plaintiffs, against Dr. George A. Constant and Dr. F. S. (Ted) Shields, the County of Victoria, Texas, and the Citizens Memorial Hospital of Victoria, Texas, as defendants, to recover damages for the injuries sustained by Mrs. Estelle Howe while under the care of Drs. Constant and Shields and while a patient in Memorial Hospital. A trial before a jury was had, and at the end of two days of testimony and both

sides closing, the trial court sustained the motions of all defendants for an instructed verdict in favor of all defendants. A take-nothing judgment was entered against the plaintiffs Howe and in favor of each and all of the defendants. Upon appeal, the Court of Civil Appeals reversed the trial court's judgment in so far as plaintiffs' cause of action against the two doctors and remanded that to the trial court, but affirmed the trial court's judgment in favor of Victoria County and Citizens Memorial Hospital. 426 S.W.2d 882.

Only the doctors appealed from the Court of Civil Appeals judgment reversing and remanding for trial the plaintiffs' cause of action against them. Plaintiffs perfected no appeal from the judgment affirming the trial court's action in regard to Victoria County, Texas, and Citizens Memorial Hospital, and this phase of the case is not before us. We granted the application for writ of error on behalf of both doctors.

After a careful study of the statement of facts, we reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court that plaintiffs taking nothing against the doctors.

The trial court having sustained the doctors' motion for an instructed verdict, we must accept as true the evidence in the record supporting plaintiffs' allegations of negligence against the doctors. All conflicts and inconsistencies must be resolved in favor of plaintiffs, and we must draw all inferences therefrom most favorable to the plaintiffs' alleged cause of action. Hart v. Van Zandt, Tex.Sup., 399 S.W.2d 791, 793 (1965); Adams v. Slattery, 156 Tex. 433, 295 S.W.2d 859, 865 (1956), and authorities cited therein on this point.

In their action for recovery against the doctor defendants for their negligence proximately causing the injury to Mrs. Howe, plaintiffs alleged the following specific acts of negligence: (1) that the Defendant Dr. Shields was negligent in failing to supervise and properly tie the glissando sheet on Mrs. Howe; (2) that Dr. Shields failed to inspect the glissando sheet immediately after the application of same to Mrs. Howe; (3) that Dr. Shields failed to properly instruct the attendants assisting in the application of the sheet to Mrs. Howe; (4) that Dr. Shields failed to return to her room and inspect the glissando sheet as it had been applied to Mrs. Howe before leaving the hospital, in order to be sure that its ties were properly placed; and (5) that Dr. Shields failed to instruct the attendants and nurses to apply to the bed restraining bed boards or rails to prevent Mrs. Howe from falling from her bed and injuring herself.

Keeping in mind these grounds on which plaintiffs sought recovery against the doctor defendants, let us examine the evidence given in this case.

Plaintiff Mrs. Estelle Howe entered defendant hospital on January 11, 1963, as a patient of Dr. Constant. She was suffering from a schizzo-affective disorder and attending depression. A course of glissando therapy was prescribed for her by Dr. Constant to be given daily with some exceptions. This treatment is a form of electric shock treatment given by the application of metal plates to the sides of the head, which plates are attached to an electrical device which regulates the amount of current administered to the patient. The treatment consists of three phases: (1) administration of medications to place the patient in a comatose condition during and for about four or five hours after the second phase; (2) electric shock therapy, in which the actual electric impulse is administered for only one second, but its severity causes the patient to go into violent muscular spasms for from forty to fifty seconds, during which time she is held on the bed by two members of the "team"; and (3) restraint of the patient for a period of about four or five hours until the effects of the shock treatment and medication have worn

off. The record is emphatic as to the importance and necessity of the restraint phase of the treatment during the time that the patient remains in a confused, disoriented, drugged mental condition. Neither in their pleadings nor evidence do plaintiffs raise any issue of negligence with reference to the first two phases of the therapy mentioned above; their only complaint concerns phase three of the treatment and deals with the alleged failure to properly restrain the patient after the shock had been applied to keep her from falling from her bed or otherwise injuring herself.

Restraining bedrails, although available, were not ordinarily used in the psychiatric ward by Dr. Constant to protect comatose drugged patients from falling out of bed. The manner of restraint used was what is known as a glissando sheet. This sheet is made of heavy canvas or ducking, with six ties on each side which, when placed over the patient in bed and *properly* attached and tied to the bed would in most cases, as testified to by the doctor defendants and other witnesses, prevent the patient from getting from under it and falling out of bed. According to testimony given by defendant doctors, the patients should have been unable to release themselves from this sheet during phase (3), had it been properly secured to the bed. Some patients were cunning and smart enough to untie properly tied sheets. As a part of the third phase of the therapy, the doctor in charge of administering the treatment is to supervise the restraining of the patient.

On January 22, 1963, at about 11:00 A.M. Mrs. Howe was given her ninth glissando treatment since January 11, with Dr. Shields in charge. On previous admissions Mrs. Howe had received approximately twenty similar electric shock treatments. There were fourteen patients in the ward to receive such treatment, with plaintiff, due to the location of her room, as the twelfth patient. Medication was administered about an hour before the doc-

tor and his team reached her room. The electrical impulse treatment (shock) was duly given; the patient was held until she had completed her immediate convulsions. When the convulsions stopped the glissando sheet was spread over the patient and the side ties tied in two hard knots and a bow knot. Dr. Shields testified he and the team plus a hospital orderly tied down the patient under the glissando sheet and then he moved on to the next room occupied by a patient prepared to receive the electrical shocks. He testified that it was his custom to remain with the patient until the sheet was tied by the hospital employees—nurses and orderly—and that he inspected the sheet and ties on Mrs. Howe on the day in question and, in his opinion, they were all properly tied. He also testified that when he had finished giving the shock treatment to the fourteenth and last patient to be so treated for that day, he walked down the hall the way he had come and looked through the open door of each patient's room, including Mrs. Howe's room, to see if everything was in proper order, and that it was. Finding everything in good order with the glissando sheets of the patients and nothing unusual having been reported to him by the nurses on the fourth floor, he went to his office. This was around 11:30 to 11:45 A.M.

The witness Mrs. May Smith testified by deposition introduced by plaintiffs to facts showing her qualifications as a Licensed Vocational Nurse and that she was a member of the treating team which included the doctor giving the treatment, a hospital orderly, Bennie Pena, and one or two other nurses. She testified that she had more than fifteen years experience as a nurse for psychiatric patients receiving shock treatments. These nurses and the orderly were employed and paid by the hospital and also looked after patients on the fourth floor other than psychiatric patients taking glissando treatments. The fourth floor had rooms to accommodate twenty-six patients, and on the day in question there were patients on

the fourth floor other than the glissando treatment patients. Mrs. Smith testified that it took the nurses, orderly and treating doctor from fifteen to twenty minutes in each patient's room to give the treatments and properly tie down the glissando or restraint sheet. After Mrs. Howe had been treated and her convulsions that followed the treatment were over, Mrs. Smith and Bennie tied the glissando sheet over Mrs. Howe so as to prevent her getting out of the bed and hurting herself while she was still in an unconscious state from the pre-treatment medication administered so as to render the patient unconscious at the time of the treatment. Mrs. Smith and Bennie securely tied the straps with a double knot and then a bow knot. The patient was inspected every five to ten minutes to see that she was securely tied under this sheet. Mrs. Smith testified that Dr. Shields was not in Mrs. Howe's room when the glissando sheet was tied but had gone on to the room of the next patient to be treated. She and Bennie finished tying Mrs. Howe about 11:15 or 11:30. She had checked Mrs. Howe four times before she untied Mrs. Howe and fed her her lunch and took her to the bathroom. Then they put the patient back to bed and retied the glissando sheet in the manner she had been taught was proper and was the method used in the hospital. Shortly after Mrs. Smith had put Mrs. Howe back to bed and after she had retied the restraining sheet, Mrs. Howe fell the first time. This was about 12:15 or 12:30 P.M. and about an hour prior to the second time Mrs. Howe fell. Mrs. Howe did not hurt herself when she fell the first time, and no report of her first fall was made to Dr. Shields. At this time Mrs. Smith told Mrs. Howe not to get up again and put a chair up against Mrs. Howe's bed to remind her not to get out of bed. The top of this chair extended some twelve to sixteen inches above the top of the bed mattress and sheets.

When Mrs. Smith and Bennie got Mrs. Howe back in bed after the first fall, they made a roll out of a bed sheet and tied it around each of Mrs. Howe's legs above the ankles with a half-hitch fastener and then tied each end of this rolled sheet to the foot of the bed so as to act as additional restraint preventing Mrs. Howe from again getting out of bed. They also retied the glissando sheet over Mrs. Howe as previously tied so as to hold her on the bed, and Mrs. Smith told Mrs. Howe to stay in bed and not to untie the sheet again. About one hour later at about 1:30 P.M. and after Mrs. Smith had continued to check on Mrs. Howe and while there was no one in Mrs. Howe's room, Bennie came to Mrs. Smith and said that Mrs. Howe had again fallen and was out of bed and on the floor "quite a ways from the bed and was trying to crawl" to the door on her hands and knees and was about 3 feet from the door. Mrs. Smith said something to Mrs. Howe about getting out of bed again, and Mrs. Howe apologized for not minding and said she had forgotten. Mrs. Smith and Bennie put Mrs. Howe back in bed. They thought she had a broken hip this time and so notified the doctor, who ordered x-rays taken and surgery to correct the broken hip. Mrs. Smith testified that Mrs. Howe had to climb over the chair against the bed in order to get out of bed. Mrs. Smith said that although the patients usually could not get out from under the glissando sheet, some of them were very smart and cunning and could untie the best tied sheets and get out from under the sheet. It is when a patient does untie the ties and escapes from the sheet that a sheet-rope is tied around the patient's feet and made fast to the bed in order to try to prevent her again escaping the glissando sheet and getting out of bed. Mrs. Smith was asked about the use of bedrails as a restraining device, and testified as follows:

A "We don't have siderails on the fourth floor unless we have a medical patient who is senile and we very seldom ever use them then because the bedrails, the siderails as you call them, they

have a tendency to want to crawl over them. They are just like a child in a crib. When you put them up there it's just something, its an obstacle for them to come over."

When asked her opinion as to whether Mrs. Howe got out of bed and then fell and broke her hip or if Mrs. Howe fell out of bed and broke her hip in the fall, Mrs. Smith said her opinion was that Mrs. Howe first got out of bed and then fell, breaking her hip. Mrs. Smith's testimony was not contradicted.

Dr. Timmerman, an osteopathic doctor and temporary administrator of Aransas Pass Hospital, testified that he had examined and treated Mrs. Howe for her broken hip and to the effects the broken hip had on Mrs. Howe and the probable duration of the injury and her suffering therefrom.

Upon development of a bill of exceptions, he testified that his hospital had no psychiatric ward and they gave no glissando treatments; that they did treat some more violent psychiatric patients on a temporary basis; that they used bedrails and not glissando sheets to restrain their patients in need of restraint, and he supposed the reason they did not use glissando sheets was that they had a greater proportion of nurses to patients than the large hospitals and also because of "public opinion." He said bedrails would not restrain a patient in the bed and that a patient could crawl over the rails. He said his hospital staff and nurses used such restraining measures as were necessary to restrain the particular patients, and on occasion had used handcuffs until he found out that was a violation of the law. Dr. Timmerman testified for the bill that bedrails were a great aid in keeping patients in bed, and that a restraining sheet, plus bedrails would more adequately insure that the patient would stay in bed. No complaint is brought to this Court as to the denial of the trial court to permit Dr. Timmerman to give the included testimony shown by the bill before the trial jury.

Plaintiffs only sought recovery against the defendant, Dr. Constant on the ground of respondeat superior, in that he was the employer of Dr. Shields and as such, liable for the negligence of Dr. Shields. The testimony establishes without dispute that Dr. Shields was a paid employee of Dr. Constant in giving the electric shock treatments and looking after the patients so treated when the shock treatment was over. The evidence also establishes beyond controversy that Dr. Constant was not present at the hospital on the day Mrs. Howe was given the glissando treatment and had nothing personally to do with the events for which this suit is brought. Dr. Constant testified that it was usual and customary for the treating doctor present to supervise the tying of the glissando sheet on the patient, and that the treating doctor may and usually does help. He also testified that the nurses on duty were instructed to go into the patient's room after the treatment and check the patient and the ties on the glissando sheet as rapidly as they can with no specific time limit for checking but the nurses must stay on their feet and check each patient in his room until the patient regains consciousness from the treatment and until the prior treatment medication has worn off so that the patient is aware of his surroundings. Dr. Constant further testified:

A "Well, the only thing is that it is standard procedure that if a person is having difficulty like getting out from under the sheet and so on, we ask them to secure their ankles to the side of the bed and so on.

Q With a strap?

A No, with a regular sheet.

Q You say there were not any actual sideboards or anything like that put on this bed?

A No.

Q They were available for all the beds in the hospital?

A Oh, yes, they were available but we find that a restraining sheet works much better."

When asked how Mrs. Howe could have fallen out of bed if the glissando sheet had been over her and properly tied, he answered he did not know what happened; that he was not there but there are all sorts of possibilities, and he could not answer with any authority; that Mrs. Howe should have still been under the glissando sheet at 12:30 P.M., the time of her first fall, if the sheet had been properly tied.

We have detailed the evidence at some length in view of the fact that an instructed verdict was given at the conclusion of the plaintiffs' evidence. This Court in the case of Hart v. Van Zandt, Tex. Sup., 399 S.W.2d 791 (1965), declared the recognized rule as to the burden a plaintiff must bear in a medical malpractice case as follows:

"In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury. Ewing v. Goode, 78 F. 442, 444 (C.C.Ohio, 1897); Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R.2d 1 (1949); Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933, 264 S.W.2d 689 (1954)."

When we apply this rule of law to the record before us, we hold that the trial court correctly instructed a verdict for the defendant doctors. There is no evidence in this record that the glissando sheet was not properly tied on the side, foot and top of the bed by Mrs. Smith and Bennie Pena as soon as Mrs. Howe had recovered from the convulsions following the administration of the electric shock treatment by Dr. Shields. The undisputed evidence shows that these ties on this sheet at that particular time were tied in accordance with the recognized method of keeping the patient on the bed and preventing the patient from getting out of bed. The evidence also shows that the sheet did restrain Mrs. Howe from getting out of bed. It further shows that the sheet was still tied properly and had to be united some twenty-five to forty minutes later when Mrs. Smith fed Mrs. Howe and took her to the bathroom. The only evidence in the record and from the witness, Mrs. Smith, was that when she and the orderly put Mrs. Howe back to bed after her feeding, etc., the ties were again properly tied by these two attendants. The evidence further shows that Mrs. Smith made the kind and character of inspection of Mrs. Howe—each five to ten minutes— as was testified without contradiction, to be the proper standard of care regarding necessary inspection in cases such as this one. Therefore, there was no negligence on the part of Dr. Shields with regard to the tying of the glissando sheet on Mrs. Howe after the shock treatment and while Dr. Shields was responsible for Mrs. Howe's restraint. There is no evidence in the record that the proper standard of care on the part of the treating doctor required that he stay in each patient's room after the patient's treatment until the patient became conscious and oriented to his surroundings. With fourteen patients under treatment it would be a physical impossibility for a doctor to stay in each patient's room continuously. The evidence is that it was the duty of the nurses who were a part of the team to make five to

ten minute inspections of each patient, and the uncontradicted evidence herein shows that this was done.

Mrs. Dorothy Swickheimer, a witness for plaintiffs, testified that she was the Administrator of the Citizens Memorial Hospital and had the responsibility for seeing that the hospital functions to its best capacity in all departments; that she was an experienced registered nurse and had under her charge the Director of Nursing Service and the Dietary Food Service Manager. She said that the hospital used as a device to restrain or protect a patient a restraint sheet made of heavy ducking that fits over the top of the patient and ties over the siderails of the bed. This is sometimes called a glissando sheet and is the only method used to restrain patients at the Memorial Hospital. In answer to a question regarding the use of an ordinary bed sheet by using it to tie people's ankles or legs or arms to things, she stated:

A "There are so many different techniques. We prefer and we teach the use of the restraint sheet. I have in my past nursing experience, not at Citizens Hospital, used everything from the old time straight jacket to the type of restraint sheet which you place over the chest, over the knees, over the legs, in addition by cordoning the wrist and the arms and jaws, wrapping it and tying them. Now will you say do I teach? I do not teach, but we in our hospital use the more effective restraint sheet."

She further testified that an ordinary bed sheet was sometimes used to tie a patient in bed but that it was not customary to use the ordinary bed sheet for restraint purposes in Memorial Hospital, "[b]ecause that is what our restraint sheets are supposedly for." She testified that bedrails are advisable on the side of the bed of a person who is heavily sedated or medicated, who did not know where they were or what they were doing and were disoriented.

She testified that it would not be unusual to use both the restraint sheet and bedrails together but that if it was necessary to use the restraint sheet, then the siderails may or may not be used. She answered the question:

Q "Do you have an opinion based upon your experience and training as to whether or not a person can get out from under that sheet if it is properly applied and tied?

A "Mr. Andrews, I can only answer you on the basis of my experience that when you have a patient who needs restraint and is ill enough you restrain them. I have seen patients in emotion and stress under conditions where there is nothing anybody could put on them that could hold them or keep them. There are some patients you can't do anything with. * * * I can't say any restraint sheet is going to always hold a patient depending upon how sick the individual is."

As to the siderails being put up on a patient's bed, all the evidence is that the standard of care in restraining patients after treatment was to use the glissando sheet properly tied down and that siderails were not used in the psychiatric ward for such restraint (1) because they would not restrain the patient *on the bed,* and (2) experience had taught that patients, like children, were encouraged by the siderails to climb out of the bed. The extent of Dr. Timmerman's testimony was that siderails rather than glissando sheets were used in his hospital, but as far as the doctor would go regarding the use of siderails was to testify that they were a *great aid,* and when used in connection with the glissando sheet, would make it more difficult for a patient to get out of bed or fall out of bed. He also testified that he had no psychiatric ward in his hospital and only treated patients needing shock treatment as an emergency measure and until they could be moved to a hospital having a psychiatric ward. He testified

that the reason they did not use glissando sheets was that his hospital had more nurses in proportion to patients, the lack of treatment of psychiatric patients and "public opinion," whatever that means.

The only standard of care established by the evidence was that used by Dr. Shields and the Victoria Hospital nursing staff. Therefore, there was no negligence established as is required in these malpractice cases, and the trial court properly instructed a verdict for the defendant doctors.

The judgment of the Court of Civil Appeals is reversed and that of the trial court affirmed.