Alton KOENNING, Appellant,

v.

MANCO CORPORATION et al., Appellees.

No. 899.

Court of Civil Appeals of Texas, Corpus Christi.

April 3, 1975.

Rehearing Denied April 24, 1975.

E. B. Grimes, Robstown, Norman L. Utter, Utter & Chase, Corpus Christi, for appellant.

Allen Wood, Wood, Burney, Nesbitt & Ryan, Lev Hunt, Kleberg, Mobley, Lockett & Weil, Corpus Christi, for appellees.

## OPINION

YOUNG, Justice.

This is an action brought on March 23, 1972, by Alton Koenning against Manco Corporation, John D. Manley, III (president of Manco) and South-Tex Corporation. In this action, Koenning seeks to recover the value of his royalty interest. (.03125) in natural gas removed from the Mounger-Koenning 80 acre lease by Manco Corporation, as operator-lessee of the leased premises, and processed by South-Tex Corporation. Koenning contends that he has a contract with both South-Tex and Manco whereby Manco was to allow South-Tex to remove and process natural gas. Under their contract Koenning contends that South-Tex was to sell all natural gas allowed to be sold by the Railroad Commission of Texas. The remaining un-sold natural gas, after a deduction of 5% of total volume for shrinkage and fuel usage by the South-Tex plant, was to be injected back into the Bertram Sand (part of which lay under Koenning's 80 acres). Koenning was not to be paid for the 5% of volume attributed to fuel usage and shrinkage; nor was he to be paid the volume of gas injected back into the Bertram Sand.

Further, Koenning contends that the reports filed with the Railroad Commission by Manco and South-Tex and the "Gas Statements" furnished to Koenning by Manco during the period between January 1, 1966, and June 30, 1969, were all false. Then he asserts that the purpose of these statements and various other communications between Manco and South-Tex was to conceal the fact that South-Tex was not actually injecting gas into the Bertram Sand. He argues that such conduct was a breach of his contract with Manco and South-Tex and was fraud.

In his pleadings, Koenning alleged that Manco and Manley were grossly negligent in several respects. Generally, this part of his pleadings deal with Manco's failures: to inspect the gas meters on the leased premises; to maintain a second set of meters on the leased premises; to certify the accuracy of South-Tex's statements regarding injection of gas. As a result of such gross negligence and fraud, Koenning requests actual and exemplary damages of each of the defendants. Additionally, he contends that the improper measuring of gas removed from his premises also constituted breach of contract by the defendants.

All defendants pleaded both the two year and four year statute of limitations. South-Tex contends that it has no contract with appellant. And all contend that there is no evidence to support any of the causes asserted by Koenning. In the alternative, Manco pleaded for a judgment over against South-Tex in the event that it should be held liable to Koenning for any damages.

Trial was commenced before a jury. After plaintiff presented his evidence, all defendants filed motions for instructed verdict. The trial court granted all these motions, but in the judgment the court stated no grounds upon which it relied. Koenning appeals.

In his eight points of error, the appellant complains that the trial court erred in its action of removing the case from the jury and entering an instructed verdict favoring all defendants because there was some evidence to prove all elements of his several causes of action.

■ In evaluating appellant's contentions, we will be guided by these rules:

1. An appeal from a directed verdict (or instructed verdict) presents a "no evidence" point. Shubert v. Fidelity & Casualty Company of New York, 467 S. W.2d 662 (Tex.Civ.App.—Houston (1st Dist.) 1971, writ ref'd n. r. e.).

2. Therefore, evidence supporting appellant's position must be accepted as true and all conflicts and inconsistencies must be resolved in appellant's favor. Constant v. Howe, 436 S.W.2d 115 (Tex.Sup.1968); Walter E. Heller & Company v. Allen, 412 S.W.2d 712 (Tex.Civ.App.—Corpus Christi 1967, writ ref'd n. r. e.).

We will now discuss appellant's contentions that he has a contract with both South-Tex and Manco and whether both committed breaches causing damages to him.

In that regard, we consider South-Tex first. Besides his contention that he has established evidence upon each element in contract against South-Tex, the appellant argues that he is a third party beneficiary to those contracts pleaded and proved to which he is not a direct party. And as we have noted, South-Tex asserts that appellant has not pleaded a contract with South-Tex.

■ An examination of appellant's pleadings, first amended original petition, complicates the issue at hand. It is elementary that there must be an allegation of a contractual relationship. It is necessary that the petition aver every material part of the contract and so much of it as essential to the cause of action should be specially set out. Since no recovery can be had for a breach of contract that is not pleaded, the petition must show a breach of the contract by the defendant, and is defective if it fails to do so. See 13 Tex. Jur.2d Contracts §§ 374, 378. Appellant's petition regarding a contract cause of action against South-Tex reveals the following:

1. The only allegation of a contractual relationship between appellant and South-Tex is contained in paragraph 5. This paragraph merely alleges that a special relationship of trust and confidence and dependency "existed between Plaintiff and Defendants because of their written contract (Exhibit B) . . . ."

a. "Exhibit B" is a division order executed by appellant in favor of Manco Corporation. Appellant's petition notes in paragraph 3 thereof that the parties to the division order agree to be bound by the terms, amendments, extensions and renewals of "an agreement dated April 23, 1953, between James Kennedy and John A. Koch, Trustees, Horsting Oil Company, as owner and South-Tex Corporation, as processor, . . ."

b. Neither the 1953 agreement nor any of the terms or amendments are attached to or plead in appellant's petition.

2. Appellant pleaded in paragraph 6 that he was not paid for 928,485 MCF (MCF meaning 1000 cubic feet) of gas which was removed from his lease between January 1, 1966 and June 30, 1969.

3. Appellant pleaded that Manco filed reports with the Railroad Commission of Texas which represented that 928,485 MCF of gas had been injected according to the division order entered into between Manco and appellant. Appellant further pleaded that Manco and Manley furnished appellant a monthly "Gas Statement" and check attached thereto which purported to pay appellant for all gas sold off appellant's premises; that such statements were untrue because no injection credits were taken; that South-Tex knew of and ratified such monthly practice and concealed the fact that Manco was not reporting the true value of gas being produced and sold off appellant's premises.

4. Appellant alleged that after his discovery of "Defendants untrue representation" he demanded payment from Manley, Manco, and South-Tex.

█ There can be no doubt that appellant's pleadings in regard to a contract cause of action against South-Tex are defective because there are no allegations of any terms or contractual duties upon which appellant seeks to hold South-Tex liable. Nor are there allegations that appellant is the intended beneficiary of any contract to which South-Tex is a party. Appellant's agreement to be bound by the terms of the 1953 agreement was between appellant and Manco. This does not mean, however, that South-Tex agreed to be bound by any agreement between Manco and appellant.

█ No special exceptions were directed by South-Tex to appellant's "First Amended Original Petition". We are thus confronted with the issue of trial by consent. At the trial, the following documents upon which appellant bases his allegation of a cause of action in contract were introduced:

1. An Oil, Gas, and Mineral Lease, executed August 9, 1940 covering the Mounger-Koenning 80 acres. Appellant is a successor in title to the Lessor (Moun-

ger) therein. This document was attached to and incorporated into appellant's pleadings.

2. A 1945 processing agreement between C. P. Burton (who acquired the oil and gas lease conveyed in the 1940 lease) and the Agua Dulce company.

3. An agreement dated April 23, 1953, replaced and superseded the 1945 agreement. The parties to the 1953 agreement were Mr. Kennedy and Mr. Koch, Trustees for Horsting Oil Company (Operator), and South-Tex Corporation (Processor). The agreement covers the Mounger-Koenning 80 acres, but it did not provide that it would modify or become a part of the 1940 lease. This 1953 agreement provided: that residue gas would be returned to the sand from which it was produced through operator's injection well; that the gas removed and returned was to be measured by orifice meters "operated by processor and checked periodically for accuracy"; the compensation to South-Tex for returning the gas to the Bertram Sand; that processor be operator's agent for the sale of operator's gas and the collection of the funds received; that processor was obligated to furnish operator a "statement" showing the amount of gas delivered to processor hereunder during the preceeding calendar month, the amount of plant products extracted therefrom, the amount of such products and residue gas actually marketed *and the amount of residue gas* returned to the Bertram Sand; that processor pay, from operator's share, all royalties due and payable under oil and gas leases; that the "statement" would be considered correct after the passage of 90 days. The 1940 lease was described in an exhibit attached to the 1953 agreement, but the lease itself was not specifically incorporated into the agreement.

4. An amendment of the 1953 agreement by letter agreement on May 25, 1962, which allowed South-Tex to use

the Purl #2 and #4 wells as injection wells. (The four Purl wells were on premises adjoining appellant's premises.)

5. A further amendment of the 1953 agreement dated July 25, 1966. This amendment was between Manco and South-Tex and extended the term of the 1953 agreement. It provided that processor would pay operator 100% of proceeds from gas and plant products sold if Manco would furnish South-Tex with a division order signed by all owners of interest in the gas produced from the lease. Processor also agreed to furnish operator a statement showing gas marketed and "gas returned to the Bertram Sand". Operator agreed to pay all royalties due and payable under the terms of the leases as well as overrides, production payments and claims of third parties which may be charged against operator's share of such production.

6. A gas division order executed by Koenning on July 15, 1966, in which he agreed that he and Manco would be bound by an "agreement dated April 23, 1953, between James E. Kennedy and John A. Koch, Trustees, Horsting Oil Company, as owner and South-Tex Corporation, as processor, all terms and covenants contained therein, and any amendments, extensions, or renewals thereof. . . ." Appellant specifically pleaded this division order.

7. A gas transfer order dated May 25, 1961, was addressed to South-Tex. There appellant agreed to the terms and conditions of the gas processing contract and division order under which gas from the 80-acre lease is received and payment therefor is made. This document was not a part of appellant's pleading nor was it referred to therein. Also, the agreements referred to therein were not specifically incorporated into the transfer order nor was it agreed that said order became a part of those agreements.

8. A division order dated July 9, 1962, for oil produced from the 80-acre lease.

The order is addressed to the Permian Corporation (not a party to this suit).

Has South-Tex, by allowing documents into evidence without objection, permitted the issues of the existence of a contract and the alleged breach thereof, to be tried by consent? We think so. Texas Rules of Civil Procedure, rule 67 (1967). See Deffebach and Brown, Waiver of Pleading Defects and Insufficiencies in Texas, 36 Tex.L.Rev. 459 (1958).

■ Because we have determined that the issue of appellant's contract cause of action against South-Tex was tried by consent, we must now determine whether there was any fact issue about that contract. It would appear that appellant's contract claim centers around the 1961 gas transfer order, the 1953 agreement, and the 1966 amendment of the 1953 agreement. The gas transfer order is addressed to South-Tex Corporation. By this instrument, appellant agreed that South-Tex Corporation should allow him credit for a .01562600 interest in gas produced from the 80-acre lease. Appellant also agreed to the terms and conditions of the gas processing contract and division order under which gas from the 80-acre lease was received and payment therefor is made. Under those facts and circumstances the gas transfer order created a contractual relationship between South-Tex and appellant. Chicago Corporation v. Wall, 156 Tex. 217, 293 S.W.2d 844 (1956). In executing the transfer order and accepting payment thereunder appellant ratified the gas processing contract and division order referred to therein. Williams & Meyers, Oil and Gas Law § 708 (1972); Texas & Pacific Coal & Oil Company v. Kirtley, 288 S.W. 619 (Tex.Civ.App.—Eastland 1926, writ ref'd). In *Kirtley*, the court held that the parties to a division order had ratified an oil and gas lease to which they were not a party. The court noted that in doing so, they became "so much bound thereby as though they had joined in the execution thereof." Thus, having ratified the gas processing contract referred to in the gas

transfer order, appellant is bound thereby. It would follow that appellant is able to enforce that gas processing contract against South-Tex. The transfer order does not specifically identify the gas processing contract referred to. It would appear from the evidence adduced that the parties to the 1961 transfer order intended to refer to the 1953 gas processing agreement. It is undisputed that the 1953 agreement is the agreement by which gas is being sold to and paid for by South-Tex. In view of the evidence brought to light at the trial, it is clear that such evidence raised a material fact issue regarding South-Tex's compliance with the terms of the 1953 agreement. This agreement obligates South-Tex to re-inject gas produced, but not sold, from the 80-acre lease. The record is replete with testimony and documentary evidence, if believed, that South-Tex was falsely claiming to have injected gas back into the Bertram Sand.

■ In summary, the evidence shows that neither of the wells on the 80-acre lease were ever used as injection wells. There were only 4 wells on the Purl lease which could have been used as injection wells. Purl #1 was reworked in another sand in late 1966. Purl #3 was reworked in another zone in 1966. Only Purl #2 and #4 remained in the Bertram Sand after 1966. From 1966 through 1969, records indicate that Purl #2 and #4 over produced and that each well's over production was injected back into the same well. According to witness Whitley, this is not customary, requires adjustments to the wells, and is highly unlikely. Further, Purl #3 is the only well for which the expert witness Whitley could find a Railroad Commission permit allowing its use for injection purposes. Whitley concluded that there was no injection in Purl #4 because it was a producer. He further concluded that it was not logical to inject into Purl #2 because it would cause a disturbance of the oil reservoir. Whitley finally concluded that after a report by Manco in September of 1968 that South-Tex had

ceased recycling operations, no injection occurred. Moreover it is Whitley's opinion that no injection occurred during the years 1966, 1967, 1968 and 1969.

The evidence further raises the question whether the gas removed from the leased premises was not properly measured. The evidence further gives rise to the question of whether South-Tex was properly giving appellant credit for gas received on his account. Further, there is a question whether South-Tex was properly maintaining its meters on the 80-acre lease as required by the 1953 agreement which was ratified by appellant. We hold that appellant has introduced sufficient evidence to show the existence of a contract with South-Tex and the breach thereof.

Next, we will consider appellant's contentions that he has a contract with Manco and that Manco has committed breaches causing damages. In determining the propriety of the trial court's granting of appellee Manco's motion for instructed verdict regarding the contract cause of action asserted by appellant, we note that appellant has sufficiently pleaded a cause of action in contract as follows.

■ Appellant pleaded that Manco removed oil and gas as operator for the assignee of the lessee under a 1940 oil and gas lease. That lease is attached to and made a part of the pleadings.

Appellant further alleged that Manco entered into a written contract with appellant in 1966. The contract is attached to and made a part of appellant's pleadings. Appellant's petition specifically points out that appellant and Manco agreed to be bound by a 1953 agreement entered into between Manco's predecessor in title and South-Tex Corporation. The 1953 agreement was admitted into evidence.

Appellant pleaded that Manco removed gas between January 1, 1966 and June 30, 1969. Appellant alleged: that he was not paid for his share of 928,485 MCF of gas; that the fair market value of said gas was

12.78063¢ per MCF: that Manco claimed to have injected the 928,485 MCF of gas back into Bertram Sand pursuant to its contract with appellant. This claim by Manco is alleged to be false. And appellant alleged that he was not aware of the breach until April 30, 1970.

■ Having found that plaintiff has sufficiently pleaded a contractual relationship with Manco and the breach thereof by Manco, we now turn to an examination of the evidence introduced by appellant. If appellant has introduced some evidence on each of the elements of proof which he must establish, the trial court has erred in granting Manco's motion for instructed verdict upon the contract cause of action.

■ It cannot be disputed that the instrument, introduced into evidence, entitled "Gas Division Order" constituted a contract between Manco and Appellant. Chicago Corporation v. Wall, supra. Under such contract, Manco was authorized to receive gas produced from the 80-acre lease. Manco was further authorized to credit appellant with his share of gas and constituent elements produced from the leased premises. The parties to the contract expressly agreed to be bound by an "agreement dated April 23, 1953, between James E. Kennedy and John A. Koch, Trustees, Horsting Oil Company, as owner and South-Tex Corporation, as processor, all terms and covenants contained therein, and any amendments, extensions, or renewals thereof . . .". The portions of that agreement that we deem pertinent to the Manco contract question provide that the gas produced from the lease, less the volume allowed to be sold by the Texas Railroad Commission and less 5% for processing shrinkage and plant fuel, will be returned through processor's presently installed pipline to operator's injection well into the sand from which the gas was produced. Restated, appellant is to be paid for its share of gas produced less 5% for shrinkage and fuel usage less gas injected into the Bertram Sand. Further, processor is entitled to deduct charges for processing and returning residue gas to operator's input well.

■ The 1953 agreement stated that processor would pay royalties due out of operator's share of plant products and residue gas sold. This provision was amended in July, 1966. This 1966 agreement between Manco and South-Tex provided that operator would pay all royalties from its portion of plant products extracted and residue gas sold. Manco contends that this paragraph obligated it to pass on monies paid it by South-Tex and that this is the full extent of its liability to appellant. If Manco's construction of its contractual liability is followed by this court, we would have the anomalous situation where Manco is liable for gas which it removes from the leased premises only to the extent that it receives cash payments from South-Tex. In that instance, appellant would have no contractual cause of action against his lease operator for the recovery of funds due him for the gas removed by the operator from his leased premises. We feel that the clear intent of the parties as expressed in the 1966 agreement was that Manco would pay all royalties out of its share of the proceeds and would not look to South-Tex's share of the proceeds for payment of any royalties. Manco is liable to appellant for appellant's 1/32 of production (less gas reinjected and 5% shrinkage and fuel allowance). As we said above, appellant has introduced some evidence that less gas was injected than was claimed by either Manco or South-Tex.

Appellant has further introduced some evidence of the volume of gas which was not injected for which appellant has not been paid, the volume of that gas being 928,485 MCF. As heretofore noted, the market value of said gas was 12.78063¢ per MCF. Appellant's share of that gas therefore could be valued at approximately $3,708.32. Evidence of a contract, the terms thereof, the breach of the contract, and damages resulting from said breach having been introduced, the trial court

erred in granting appellee-Manco's motion for instructed verdict about appellant's alleged contract cause of action.

 At this point in our discussion, we will comment on appellant's contention that appellees breached their contract with appellant by improperly metering (or measuring) the gas removed from appellant's premises. Because we have already discussed the matter of and held that the evidence about false claims of injecting gas back into the ground raised question of fact requiring another trial, we will not lengthen this opinion by a discussion of the contentions of improper metering. We have, however, fully examined the record and hold that there is sufficient evidence to raise questions of fact about whether the gas removed was properly measured.

In another contention appellant argues that he has introduced some evidence that the "Gas Statement" furnished by Manco and South-Tex were fraudulent, and from appellant's pleadings it is evident to us that he has alleged a cause of action in fraud against appellees Manco and South-Tex Corporation in the nature of a conspiracy to defraud appellant.

 In order to prove fraud, appellant must show that the appellees made false representations of material facts with the intent to induce appellant to act upon it and that appellant did rely upon such false representation and thereby suffered damages. Ryan v. Collins, 496 S.W.2d 205 (Tex.Civ.App.—Tyler 1973, writ ref'd n. r. e.); Long v. Smith, 466 S.W.2d 32 (Tex. Civ.App.—Corpus Christi 1971, writ ref'd n. r. e.). Further, appellant must show a unity of design and purpose to inflict the injury. An essential element of proof of such common design is knowledge of the fraudulent objective. Schlumberger Well Surveying Corporation v. Nortex Oil and Gas Corporation, 435 S.W.2d 854 (Tex. Sup.1968). With these rules in mind, we must consider all evidence and reasonable inferences deducible therefrom which tend

to support appellant's cause of action. Shubert v. Fidelity & Casualty Company of New York, supra.

It is undisputed that Manco was the operator of the 80-acre lease. As operator, Manco sold gas from the lease to South-Tex Corporation as processor. This evidence raises an inference that the gas produced from the lease remained in the exclusive dominion and control of Manco and South-Tex until sold or reinjected by South-Tex. The evidence is undisputed that the market value of such gas is 12.-78083¢ per MCF.

Appellant alleged that Manco had represented to appellant, by means of "Gas Statements" which were sent to appellant on a monthly basis, that it was paying appellant for all gas sold off appellant's premises; that this representation was false. There is evidence that PX-9 through PX-16 are representative of Gas Statements that were sent to appellant for the period of time involved in this action: 1966, 1967, 1968, and 1969. The statement labeled "Gas Statement" and "Gas Distillate Statement" are the same thing. The term "volume contract" on the "Gas Statements" was identified as representing the volume of gas, oil, distillation, etc., that were run off the lease and for which Manco was paid. The statements, however, do not show the price per MCF of gas or the price per barrel of distillate. The president of Manco testified that the term "volume contract" did not represent the actual amount of gas sold. In fact, he stated that the "Gas Statements" did not show the amount of gas sold. There was testimony in the record to the effect that PX-19 and other identical reports for some months, which were prepared by South-Tex, and PX-20 and other identical type of reports for other months, which were prepared by Manco and filed with the Railroad Commission, indicated that the figure shown as "volume contract" was the total gas produced during the month covered by the report. PX-19 and PX-20 indicate that the

"volume contract" figure shown on PX-10 exceeded the amount of gas allegedly sold by the total sums showed as injection credit, fuel, and shrinkage on PX-20. The term "injection credit" refers to gas injected back into the Bertram Sand and there was evidence that the amounts claimed as "injection credit" were not actually injected. Also South-Tex furnished the figures. There is evidence, therefore, that the statements furnished appellant were false. Moreover, Mr. Davenport, the plant superintendent of South-Tex Corporation, informed appellant that gas from the 80-acre lease was being injected into the Bertram Sand through a well on another lease: the Purl #4 well on the Purl lease. Thus, there is evidence that both Manco and South-Tex Corporation individually and jointly made false representations to appellant.

Assuming that there was no injection during the years 1966, 1967, 1968 and 1969, such fact could give rise to no other inference than that South-Tex was aware of its cessation of injection operations.

The president of Manco admitted that he was aware that South-Tex had ceased injection in the fall of 1968. Further, Manco was the operator of the wells which were allegedly used for injection purposes. These facts will certainly support an inference that Manco was aware that no injection had taken place.

There is evidence that South-Tex knew of the representations contained in the reports sent to appellant. This is shown by the fact that South-Tex provided Manco with the figures which Manco subsequently used in preparing its "Gas Statements". In addition, South-Tex's agent, Mr. Davenport, informed appellant that injection was actually occurring. These facts raise an inference that South-Tex knew of the misrepresentations and participated therein.

By letter dated May 6, 1969, Manco assured appellant that a large volume of gas had been injected that month. By letter dated April 24, 1970 Manco explained "you should keep in mind that the column marked 'injection credit' on these sheets is gas returned to the reservoir by South-Tex after processing the gas to remove liquids". Thus, we see that as late as April 24, 1970, Manco had assured appellant that the volume of gas listed as injection credit was "gas returned to the reservoir by South-Tex after Manco Corporation purchased the property in 1966."

The record shows that appellant relied upon the truth and accuracy of the "Gas Statements" which he received each month. He testified that he assumed the statements to be correct because he had been doing business with South-Tex and Manco for a long time. He further stated that South-Tex's plant manager, Albert Davenport, told him that South-Tex was injecting gas into the Purl #4 well. He further pointed out that Mr. Davenport and appellant had been personal friends for a long period of time.

■ Manco and South-Tex contend that appellant was not diligent in discovering the fraud. That which constitutes reasonable diligence in discovering fraud is a fact question for the jury, unless the evidence is such that reasonable minds could not differ. Ruebeck v. Hunt, 142 Tex. 167, 176 S.W.2d 738 (1943); Bush v. Stone, 500 S.W.2d 885 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.); Polk Terrace, Inc. v. Harper, 386 S.W.2d 588 (Tex.Civ.App.—Tyler 1965, writ ref'd n. r. e.). As noted by this Court in Bush v. Stone, supra, "The mere fact that the plaintiff had the opportunity or power to investigate the fraud, is not sufficient in law to charge him with knowledge." In the case before this Court, the facts show that appellant was a farmer and rancher. Before his purchase in 1959 of the 80 acres, he had no interest in any oil and gas properties. Appellant had no experience with work in oil and gas fields. All bookkeeping and production activities were ex-

clusively within the control of appellees, Manco and South-Tex.

It is evident, however, that appellant was aware that all was not well as early as May of 1969. Appellant testified that he had been on both the Mounger and Purl leases in that month. He was investigating gas meter inaccuracies and discovered that the markings on the meter charts did not correspond to the markings on the meter flange. He further testified that he went to Purl #4 well and discovered that it was not being used as an injection well. He went to the well because South-Tex's plant-manager had told him that Purl #4 was being used for injection purposes. Appellant stated that upon his investigation of the Purl #4 well, he consulted with his attorney. The evidence also reveals that appellant and his expert witness (Mr. Goodenough) had investigated the accuracy of the gas meters on the leased premises. By exhibits that are responses to inquiries by appellant's attorney, it is evident that the attorney was investigating and gathering facts to determine the possibility of fraud or contract violations by South-Tex and Manco.

Despite verbal assurance by Mr. Davenport that gas was being injected in the Purl #4 well, appellant proceeded to investigate the matter for himself. His statements show that he was convinced that no injection was occurring at the Purl #4 well.

■ Because appellant's investigation began in May of 1969, he failed to commence this action within the time limits prescribed by Vernon's Tex.Rev.Civ.Stat. Ann. art. 5526 (1958) (two year statute of limitations). This is so because knowledge of facts that would have excited inquiry in the mind of a reasonably prudent person, which if pursued by him with reasonable diligence would lead to the discovery of fraud, is equivalent to knowledge of the fraud as a matter of law. Bush v. Stone,

supra. After appellant had already begun his investigation, he did not terminate it when informed by South-Tex's agent that injection was occurring at the Purl #4 well. Appellant's fraud action against appellees South-Tex and Manco was barred in May of 1971 and was barred when he filed suit in 1972.

There is evidence, however, that the statute of limitations was tolled until May of 1969. So we cannot hold as a matter of law that the four year statute applicable to written contracts has run. Tex.Rev.Civ. Stat.Ann. art. 5527 (1958).

■ One other matter urged by the appellees must be considered. They assert that paragraph VIII of the 1953 agreement (PX 3b) is binding upon appellant. That paragraph provides:

"Operator shall be afforded reasonable facilities at Processor's principal office during regular office hours for checking and verifying the correctness of the monthly statements furnished by Processor to Operator. In the absence of verification or checking and written notice of incorrectness of statements furnished by processor, such statements and records upon which the same are based shall, after the expiration of ninety (90) days after delivery of such statements, be considered correct."

This contention by appellees is without merit. Although appellant has agreed to be bound by the terms of the 1953 agreement, paragraph VIII is clearly not applicable to appellant. This is evidenced by the statement that "Operator shall be afforded reasonable facilities" for inspection. Further, the statements which South-Tex furnished to Manco were not furnished to appellant. The "Gas Statements" which Manco furnished to appellant were clearly not contemplated by the 1953 agreement.

■ In other contentions by the appellant, he complains that the trial court erred

in granting the motions for instructed verdict of South-Tex and Manco on the issue of exemplary damages. Appellant claims that it is entitled to go to the jury on the issue of exemplary damages. He seeks exemplary damages for appellees' alleged acts of fraud and gross negligence. It should be noted that appellant did not plead any act of gross negligence by South-Tex. The trial court was correct in granting the motions for instructed verdict on the issue of exemplary damages, because the tort actions which form the basis of appellant's request for exemplary damages are barred by the two year statute of limitations. The only right upon which appellant may sue is that created by contract, and exemplary damages are not recoverable in a suit for breach of contract. A. L. Carter Lumber Co. v. Saide, 140 Tex. 523, 168 S.W.2d 629 (1943); Delhi Pipeline Corporation v. Lewis, Inc., 408 S.W.2d 295 (Tex.Civ.App. —Corpus Christi—1966, no writ).

■ Finally, appellant argues that the trial court erred granting appellee Manley's motion for instructed verdict and thus holding that Manley, as a corporate officer, could not be held personally liable for tortious acts that he performs while acting for the corporation. Appellant's statement of the law appears to be correct. See Permian Petroleum Company v. Barrow, 484 S.W.2d 631 (Tex.Civ.App.—El Paso 1972, no writ). But the actions for fraud and gross negligence are barred by Article 5526, supra.

We here hold that the appellant is entitled to another trial on his contract actions against South-Tex and Manco and that the trial court erred in its action of instructing a verdict in their favor. We also hold that the trial court was correct in its action of instructing a verdict in favor of Manley. Costs shall be assessed 90% against South-Tex and Manco and 10% against Koenning.

The judgment of the trial court is affirmed in part and reversed and remanded in part.