Harlen SMITH et ux., Appellants,

v.

Dr. Aubrey E. GUTHRIE, II, Appellee.

No. 17889.

Court of Civil Appeals of Texas,
Fort Worth.

Oct. 13, 1977.

Rehearing Denied Nov. 10, 1977.

Mullinax, Wells, Mauzy & Baab, Inc., and Otto B. Mullinax, Dallas, for appellants.

Shannon, Gracey, Ratliff & Miller, David E. Keltner and Kleber C. Miller, Fort Worth, for appellee.

## OPINION

SPURLOCK, Justice.

This is a medical malpractice case. The alleged malpractice consisted of the defendant-doctor's incorrect diagnosis of heart disease, when in reality, the patient did not have any such heart disease. At the trial, the judge excluded much of the testimony of the plaintiffs' medical expert. Upon the defendant's motion at the conclusion of the evidence, the trial court withdrew the case from the jury and rendered judgment in favor of the defendant as a matter of law, because (inter alia) there was no testimony in the case which established any standard of practice which had been violated by the defendant, and there was no expert testimony upon which to base any issue to be submitted to the jury. On appeal, the appellants contend, basically, that there was sufficient evidence to go to the jury despite the excluded testimony of their medical expert and that the medical expert's excluded testimony was admissible.

We affirm the judgment of the trial court.

In March of 1971, Jeanette Smith was admitted to Glenview Hospital by her psychiatrist, Dr. B. Rousch. While making rounds for Dr. Rousch, Dr. Aubrey Guthrie II saw Mrs. Smith for the first time. She complained of chest pains; accordingly, Dr. Guthrie ordered an E.K.G. test, the results of which were abnormal.

In November of 1971, Mrs. Smith, suffering from chest pains, was readmitted to the hospital by Dr. Rousch. Feeling that Mrs. Smith was having a heart attack, he called in Dr. Guthrie. After ordering that certain tests be administered, Dr. Guthrie concluded that the tests indicated arteriosclerotic heart disease and myocardial ischemia. At that time, he considered performing an arteriogram; however, Dr. Rousch advised against the administering of that test, due to the patient's mental state. Later, Dr. James R. Osborn was called in to examine Mrs. Smith. After performing an arteriogram, his diagnosis was that she had never had any heart disease. Plaintiffs then instituted this suit for damages against Dr. Guthrie for his misdiagnosis (inter alia) of Mrs. Smith's condition.

At the trial, plaintiffs' attorney introduced into evidence ten hospital charts covering Mrs. Smith's admissions to the hospital. Dr. Arthur Grollman, an internist and pathologist on the staff of the University of Texas Medical School at Dallas, reviewed these charts; he was offered as a witness by the plaintiffs. Upon objection by defendant's counsel, the trial court excluded most of Dr. Grollman's testimony.

By their first two points of error, the appellants contend that the trial court erred in removing the case from the jury and rendering a take-nothing judgment against them, since there were fact issues for the jury's consideration.

When a case is withdrawn from the jury, the reviewing court must view the evidence in the light most favorable to the losing party. *Anderson v. Moore,* 448 S.W.2d 105 (Tex.1969); *Vincent v. Vincent,* 320 S.W.2d 217 (Tex.Civ.App.—Beaumont 1958, writ ref'd n. r. e.). However, the appellate court must affirm the trial court's withdrawal of the case from the jury, if the record establishes any ground which en-

titles the movant to judgment as a matter of law. *Granato v. Bravo,* 498 S.W.2d 499 (Tex.Civ.App.—San Antonio 1973, no writ).

The appellants contend that there were five fact issues for the jury's consideration, which were:

"A. In Dr. Guthrie's diagnosing Jeanette Smith as suffering from arteriosclerotic heart disease during each and all of his admissions of her to Glenview Hospital when in truth she was not.

B. In Dr. Guthrie's falsely representing to Appellants that he was consulting with a heart specialist concerning Jeanette Smith's medical condition prior to her admission to Glenview Hospital on November 8, 1972.

C. In Dr. Guthrie's failure to place Jeanette Smith in the hands of a heart specialist before November 11, 1972.

D. In Dr. Guthrie's representing to Appellants that Jeanette Smith was experiencing heart attacks and had a serious heart disease prior to November 8, 1972.

E. In Dr. Guthrie's failure to have a coronary arteriogram performed on Plaintiff Jeanette Smith before November 11, 1972."

■ Appellee strenuously contends that each of these enumerated subpoints contain what is essentially an allegation of negligence on the part of the defendant-physician. In order to establish a cause of action in a medical malpractice case, a plaintiff must demonstrate by expert testimony that the acts or omissions of the physician constituted negligence. *Wilson v. Scott,* 412 S.W.2d 299, 302 (Tex.1967); *Hart v. Van Zandt,* 399 S.W.2d 791, 797 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). Thus, it is necessary for a plaintiff to introduce evidence through a medical expert that will establish a medical standard of care. This medical standard of care must be established so that the fact-finder can determine whether the doctor's acts or omissions deviated from the standard of care so as to constitute negligence or malpractice.

■ This court has examined the record to determine whether there was any evidence that established a medical standard. On direct examination, Mrs. Smith testified that after learning that she didn't have heart trouble and wasn't going to die, she asked Dr. Guthrie, "What am I going to tell my relatives and friends? Here they've been expecting me to die at any minute. Now all of a sudden I'm going to live." Then, she testified that Dr. Guthrie told her: "Just tell them you have a dumb, stupid doctor." Appellants urge that the last sentence in this testimony established the medical standard. It is true that the defendant in a medical malpractice case can establish the medical standard by his own testimony. *Wilson v. Scott, supra.* We note that it is Mrs. Smith's (rather than Dr. Guthrie's) testimony that the appellants rely upon to establish the medical standard. Even if it were Dr. Guthrie's testimony, it would not have established the requisite standard of care.

We hold that the record is lacking of any evidence establishing a medical standard of care; accordingly, we overrule points of error # 1 and # 2.

In points of error # 3 through # 10, the appellants contend that the trial court erred in excluding from the jury's consideration most of the testimony of Dr. Arthur Grollman, their medical expert.

The following are illustrative of the testimony of Dr. Grollman that the trial court, upon objection by defendant's counsel, excluded from the jury:

1. That a *reasonably prudent* doctor could not reach a firm diagnosis of arteriosclerotic heart disease, myocardial ischemia or myocardial infarction, based upon Plaintiffs' Exhibit 2, the Glenview Hospital Chart of November 1, 1971.

2. As to what *he would have done as a treating doctor* in describing a diagnosis for Jeanette Smith at the time of her discharge on her third admission to Glenview Hospital.

3. As to whether *he could have reached the diagnosis* of arteriosclerotic heart

disease through the period of the 1st, 2nd, 3rd, and 4th admissions, had he been treating Jeanette Smith and in the application of the medical practice as he knew it to be in the Dallas-Fort Worth Community.

4. As to what *he found in review* of the fourth hospital chart of Jeanette Smith's 4th admission to Glenview Hospital to support the diagnosis of arteriosclerotic heart disease, angina pectoris, or myocardial infarction.

5. What *would have been the duty of a treating doctor* up to the time of the 4th admission of Jeanette Smith, *if a diagnosis* of arteriosclerotic heart disease, angina pectoris or myocardial infarction *could not be reached as a firm medical basis.*

6. Assuming a patient such as Mrs. Jeanette Smith that you learned about in the 1st, 2nd, and 3rd admissions of the Glenview Hospital *came to you* on the 4th admission and that the conditions and circumstances as reflected by Plaintiffs' Exhibit 4, the chart of the 4th admission, occurred. Do you have an *opinion* based upon reasonable medical probabilities *and your own training and experience* as to whether an *average doctor* in the standard practice of medicine in the Dallas-Fort Worth area *could reach the diagnosis* of arteriosclerotic heart disease. (Italics added.)

The appellee urges that all of the excluded testimony of Dr. Grollman was properly excluded because of the form of the questions asked. The form of questions to expert witnesses in a medical malpractice case is very important.

In a medical malpractice case based upon misdiagnosis, the factfinder will ultimately have to decide whether the diagnosis of the doctor constituted negligence or malpractice. In a jury trial of such a case, one of the special issues for the jury will be phrased in this manner:

Did the physician make a diagnosis which a reasonable and prudent member of the medical profession would not have made under the same or similar circumstances?

A similar special issue was recently approved by the Texas Supreme Court in a medical malpractice case based upon allegations that the mode of medical treatment was not a proper remedy for the diagnosed condition. *Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex.1977).

In the case of *Snow v. Bond,* 438 S.W.2d 549, 550–51 (Tex.1969), the court wrote:
"What constitutes negligence or malpractice is a mixed question of law and fact that can only be determined by the trier of fact on the basis of evidence admitted and instructions given by the court. A medical expert is not competent to express an opinion thereon. . . . The question of what a reasonable and prudent doctor would have done under the same or similar circumstances must also be determined by the trier of fact after being advised concerning the medical standards of practice and treatment in the particular case. An expert witness can and should give information about these standards *without* summarizing, qualifying or *embellishing his evidence with expressions of opinion as to the conduct that might be expected of a hypothetical doctor similarly situated. The latter is not an appropriate subject for expert testimony.*" (Italics added.)

In *Christian v. Jeter,* 445 S.W.2d 51, 53 (Tex.Civ.App.—Waco 1969, writ ref'd n. r. e.), the court wrote in clear terms:
"*Testimony of what a reasonably prudent doctor would have done,* negligence, and whether the plaintiff's condition was due to defendant's negligence *are inadmissible* conclusions." (Italics added.)

■ It is clear to the court that an expert witness in a medical malpractice case cannot be asked what a reasonably prudent doctor or an average doctor or treating doctor or any hypothetical doctor would have done in the same or similar circumstances. All of these questions invade the province of the jury.

■ Dr. Grollman is an internist and pathologist, and of course, he has received

extensive training and education in those fields. Many of the questions asked of Dr. Grollman sought to elicit from him what he would have done or whether he could have reached the diagnosis or what he found in the review of the hospital charts. Such questions were improper in that they asked what he, a highly trained specialist, would have done. The defendant in this case is a general practitioner. As such, he cannot be held to the standard of care of a specialist. Also, it is irrelevant to the case at bar what this specialist would have done or whether he could have reached such a diagnosis.

We hold that all of Dr. Grollman's excluded testimony was properly excluded by the trial court; accordingly, we overrule points of error # 3 through # 10.

■ There are a variety of questions that can be asked of an expert witness in a medical malpractice case to establish the proper standard of care. For example, after a hospital chart has been admitted into evidence, the attorney should seek to ascertain that his expert witness is familiar with the standard practice of medicine in the Dallas-Fort Worth area. Having laid this foundation, the attorney could ask this question, among others, to establish the proper standard of care:

> Based upon plaintiffs' exhibit # 2 which has been admitted into evidence, is a diagnosis of arteriosclerotic heart disease, myocardial ischemia or myocardial infarction against the standard medical practice as found in the Dallas-Fort Worth area?

The questions asked in the case of *Cleveland v. Edwards,* 494 S.W.2d 578, 580 (Tex. Civ.App.—Houston [14th Dist.] 1973, no writ) are also proper questions to ask to establish the standard of care. See Jim M. Perdue's *The Law of Texas Medical Malpractice,* p. 118–121, Houston Law Review, Inc., (1975) for a further discussion of this point and the authorities therein cited.

By point of error # 11, the appellants contend that the trial court erred in denying their attorney "the right and opportunity to admit to the jury his instructions" to Dr. Grollman that: "Every question that I will propound to you, now I want it to be answered in light of the standard medical practice in this area as it relates to heart disease and based upon reasonable medical probabilities *and your own training and experience."* (Italics added.)

■ We overrule this point of error in that the instruction to the witness seeks to inject the standard of a specialist as the basis for answering all the questions to be propounded to him.

All of the appellants' points of error have been overruled; the judgment of the trial court is affirmed.