Dr. Alvin W. BRONWELL, Appellant,

v.

Vivian L. WILLIAMS, Appellee.

No. 9015.

Court of Civil Appeals of Texas, Amarillo.

March 31, 1980.

Rehearing Denied April 23, 1980.

Crenshaw, Dupree & Milam, Tom S. Milam, Cecil Kuhne, Lubbock, for appellant.

Burnett & Ahders, Associated, Warren Burnett, Norma Venso, Odessa, for appellee.

REYNOLDS, Chief Justice.

Doctor Alvin W. Bronwell appeals from a judgment rendered against him upon the jury's verdict in this medical malpractice action brought by Vivian L. Williams. The gravamen of the action is that the doctor negligently severed her common bile duct during gall bladder surgery, thereby injuring her.

On appeal, Dr. Bronwell complains of the absence of required medical evidence to sustain the action and the court's failure to submit his requested jury instructions. Mrs. Williams contends that she is entitled to her medical expenses as a matter of law. Under this record, the complaints and contention do not warrant the disturbance of the judgment. Affirmed.

On 24 May 1973,[1] Dr. Bronwell, a Lubbock surgeon, undertook to perform a cholecystectomy—the removal of the gall bladder—on Mrs. Williams. In her abdomen, the doctor saw a small duct which he traced to the point it entered a duct he "assumed . . . was the common bile duct." He traced the duct back up to and into the gall bladder. It was normal. Once he identified the two points, the duct was cut flush with the duct into which it entered.

Within thirty minutes after the surgery, Dr. Bronwell dictated his medical notes on the operation for the hospital records. He reported that he palpated, i. e., sensed by touch, the common bile duct which, he twice noted, was normal to palpation. Relating that the "common duct was not explored," the doctor gave this account: "The gallbladder was removed, by dissecting free the cystic duct and artery and clamping and dividing and ligating them separately and gallbladder was removed by sharp dissection and the bed was closed . . . ." The only abnormality he recorded was some fibrous tumor in the uterus.

Mrs. Williams was released from the hospital on May 30; however, because of her complaints, she was readmitted the following day. Responsive to Mrs. Williams' complaints, Dr. Bronwell told her she had hepatitis and, although he admittedly did not know then what was wrong with her, informed her that her condition "is in no way responsible to your operation." Jaundice, which could be caused intrahepatic or extrahepatic, developed. Dr. Pridmore, called into consultation by Dr. Bronwell, noted that Mrs. Williams had become increasingly jaundiced and then recorded: "The operative note reports that her common bile duct appeared normal at the time of surgery. It was not explored."

Mrs. Williams was given systematic treatment until a mass appeared in her stomach. A day or two later on June 26, Dr. Bronwell reoperated, discovering that the mass was a collection of two quarts of bile. An intensive search revealed that Mrs. Williams' common bile duct had been severed during the first operation, allowing the bile to drain into her abdominal cavity. The doctor performed an anastomosis by inserting twenty-four inches of Mrs. Williams' intestine where the common duct, which normally is three to four inches in length, had been cut.

Fifteen minutes after the operation, Dr. Bronwell dictated his notes for the hospital records. His stated diagnosis was "biliary peritonitis due to common bile duct obstruction" which, he readily admitted at trial, was not what he found. Thereafter in the body of the report, he made this observation: "[I]t was noted that at the time of the previous operation the patient had an abnormality in which the common bile duct was a part of the gallbladder which had been inadvertently removed."

A few hours after the second operation, Dr. Bronwell and Mrs. Williams had a conversation. Her version is that the doctor said "that he had goofed . . . that the common duct had been cut and that he had made this certain arrangement and that he felt that I could live a normal life with that arrangement." The doctor denied saying "goofed," his recollection being that he told Mrs. Williams he found something he had never seen before, there had been an interruption of the common bile

---

1. All dates are in the calendar year 1973, except where otherwise designated.

duct, and it was necessary for him "to make a new hookup." The next day there was another conversation, and both agreed that the doctor said Mrs. Williams was a very abnormal person.

Mrs. Williams was discharged from the hospital on July 6 and was attended until October 26 by Dr. Bronwell. Subsequently, she submitted, at the hands of other surgeons, to seven operations, three of which Dr. Bronwell knew to be to repair a stricture occurring where the common duct was cut, and all of which were to facilitate the drainage of bile. However, at trial time, bile drainage was mechanically controlled by means of a perforated tube inserted in Mrs. Williams' body and exiting through two surgically made body openings.

The first of the seven operations, performed in January of 1974 by Dr. Woolam, was for a stenosis of the anastomosis, i. e., a stricture occurring after Dr. Bronwell's second operation at the place where the common duct had been cut. The operative report of Dr. Woolam contains this information: "This woman apparently underwent a cholecystectomy several months previously at another hospital, at which time according to the records received, that congenital anomaly was found and the patient apparently suffered a common bowel [sic] duct injury."

On 28 January 1974, Mrs. Williams instituted this litigation to recover from Dr. Bronwell damages proximately caused by his negligence in severing her common duct.[2] After Dr. Bronwell answered, his deposition was taken in October of 1974. The trial commenced 1 May 1978 before a jury. Dr. Bronwell was the only medical witness; Dr. Culp, Mrs. Williams' family physician who admitted her to the hospital and assisted Dr. Bronwell in the two operations, did not testify.

By the time he first operated on Mrs. Williams, Dr. Bronwell had performed some two thousand similar operations and had seen another fourteen hundred. By the time of the trial, the doctor had performed an additional thousand or so gall bladder operations.

It was explained by Dr. Bronwell that the liver is divided into the right and left lobes from which come the right and left hepatic ducts. These ducts go to join the common duct which takes bile generated by the liver to the duodenum. From its juncture with the common duct, the cystic duct leads a few centimeters to the gall bladder and exists to carry bile in and out of the gall bladder. It is, the doctor acknowledged, important to identify the common duct in order to perform gall bladder surgery safely.

It was established by Dr. Bronwell that, according to the standard of surgical performance in the Lubbock area, a surgeon will not cut the common bile duct in a normal gall bladder operation. If everything is normal and the surgeon cuts the common duct, he has not met the standard of medical care. If the common duct is cut and not recognized and repaired, bile will be freed in the peritoneal cavity causing a chemical irritation. Sooner or later the bile will have to be drained, but it subjects the patient to liver damage which, over a period of time, goes to the point of causing death.

At the time of the first operation, Dr. Bronwell, identifying the duct he considered to be the common duct, was persuaded the common duct had not been injured. During the second operation in Dr. Bronwell's search for the source of the bile, he was made aware he previously had cut the common duct without recognizing the fact. The awareness came, the doctor said, when he cut the suture used to close the bed of the gall bladder in the first operation, the bed opened up, and he could see the stub of the common duct. In his words, "The common duct was found—the right hepatic and left hepatic where they join the common duct was found in the gall bladder bed in the liver."

At this point in the testimony, the following is recorded:

Q [by Mrs. Williams' counsel]. Now, are you going to try to deny to this Jury

2. Also pleaded, but not pursued, as a theory of recovery was the doctrine of res ipsa loquitur.

that you as a surgeon cut the common duct and let the bile flow out into this woman's peritoneal cavity?

A [by Dr. Bronwell]. No, I don't deny that, I said that from the beginning. I said, though, it was an anomaly.

Explanatorily, Dr. Bronwell said there was an abnormality in that Mrs. Williams' common duct went into her gall bladder and not into her duodenum. He never had seen the anomaly before in any of the patients undergoing gall bladder surgery. At all times, he said, he had exercised the standard of care and accepted procedure in the area in performing the surgery; however, because of Mrs. Williams' congenital anomaly, the common duct still would be cut, for Mrs. Williams "is just an unfortunate person that has a duct that lies in such an area that the usual safeguards cannot be followed," and "I do not know a way to prevent the same kind of injury."

There was no way, Dr. Bronwell declared, that the doctors performing the third and succeeding operations could identify the location of the common duct coming out of the liver as he found it in his second operation. After his second operation, the doctor said, "the anatomical landmarks are completely erased," and "the anatomy is so distorted that it [the location of the common duct] cannot be proven." It would have been an impossibility, the doctor stated, for the other doctors to determine an abnormality because the landmarks are destroyed.

When his deposition was taken in 1974, Dr. Bronwell declared that he neither knew nor had heard of a single instance of a common duct so made that it drained into the gall bladder. In the forepart of his trial testimony, the doctor stated that he had not found, either in his operations or in medical literature, an identical case, but he had researched further and found five literary articles on cases "so similar that if they were dissected out, they could have been the same way." Later in his trial testimony, the doctor said that in all of his approximately four thousand gall bladder operations, he never had seen the anomaly he

found in Mrs. Williams, he never had read of it in literature at any time, and he never heard it presented during his attendance at many seminar and medical society talks on gall bladder surgery, including anomalies that might be found in the human body.

It was Dr. Bronwell's trial recollection that, in discussing the type of repair that should be made during his second operation, he telephonically discussed the facts with Dr. Rutledge, his partner; and, in the afternoon, he discussed Mrs. Williams' abnormal anatomy with Dr. Culp and with Dr. Pridmore. He said he told Dr. Pridmore that Mrs. Williams had an abnormality he never had seen before. He further testified that he had made no written report of the condition, but in the spring of 1974 he had orally presented the facts of Mrs. Williams' abnormality, together with seventeen hundred other cases, at a meeting of surgeons. However, through his October, 1974 deposition, Dr. Bronwell testified that he had had no discussion at all of Mrs. Williams' abnormality with his medical colleagues, except Dr. Woolam, nor any discussion with any professor of surgery, except for an October, 1974 discussion with Dr. Salem. The response of Dr. Woolam and Dr. Salem was that each had never seen anything like this and hoped that he did not.

After deliberation on the evidence, the jury found that: (1) Dr. Bronwell failed to exercise ordinary care when he cut the common bile duct of Mrs. Williams; (2) such failure was a proximate cause of the damages sustained by Mrs. Williams; and (3) $200,000 would fairly and reasonably compensate Mrs. Williams for her damages. Judgment was rendered on the verdict.

■ Appealing with eight points of error, Dr. Bronwell presents complaints which may be sorted into two categories. First, he asserts there was no competent evidence to support the submission of, or the jury's answers to, the negligence and proximate cause issues, and that there is insufficient evidence to support the jury's answers thereto. Second, Dr. Bronwell alleges the trial court erred in refusing to instruct the jury that negligence and proximate cause

could be established only by the testimony of expert medical witnesses. Replying to the doctor's points of error with two counterpoints, Mrs. Williams also uses a counterpoint to contend the trial court erred in refusing to grant her motion for judgment for medical expenses.[3] All points for relief are overruled.

■ To sustain her pleaded cause of malpractice against Dr. Bronwell, Mrs. Williams had to prove by expert medical evidence that his surgery was such as to constitute negligence and that it was a proximate cause of her injuries. *See Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (1949). More explicitly, she had the burden to prove by expert medical evidence what a reasonable and prudent medical practitioner of the same school[4] and same or similar community would have done under the same or similar circumstances, that Dr. Bronwell departed from that standard, causation and damages. Dr. Bronwell was the only witness with the required medical expertise; so, if the requisite proof of negligence and proximate cause exists, it must be found in the evidence adduced from and through him. *Cf. Wilson v. Scott*, 412 S.W.2d 299, 303 (Tex.1967) (holding that the defendant doctor's own testimony may establish the medical standard), and *Humphreys v. Roberson*, 125 Tex. 558, 83 S.W.2d 311, 312 (1935) (holding that the defendant doctor's act of negligence was established by his own admission).

■ The doctor offers his trial testimony showing the abnormal location of Mrs. Williams' common duct and expressing his opinion that, because of the anomaly, the common duct would be cut in the exercise of the standard of care and standard of accepted procedure in the community in performing this surgery. He then reasons that because his testimony is not contradicted by expert medical testimony, it is binding and establishes the absence of negligence and proximate cause. Alternatively, he submits that if the jury could disregard his testimony concerning his exercise of ordinary care, there is still no evidence to support the jury finding of negligence or proximate cause, for disbelief of the testimony constitutes no evidence that the opposite is true. At least, the doctor argues, these legal standards ensure the evidence is factually insufficient to support the jury findings of negligence and proximate cause. Despite this rationale, an accurate analysis of the evidence in this somewhat unique evidential record compels adherence to legal principles different from those urged by Dr. Bronwell.

Emerging from the evidence adduced from and through Dr. Bronwell is the standard of surgical performance which, depending upon the location of the common duct in the patient's anatomy, was either departed from or observed. If the common duct is normally located, it will not be cut in a gall bladder operation unless there is a departure from the medical standard. If the common duct is in the abnormal location described by Dr. Bronwell, the duct will be cut in the same operation without a departure from the medical standard.

The critical inquiry, then, becomes: Was Mrs. Williams' common duct in a normal or abnormal location? If her common duct was normally located, Dr. Bronwell departed from the medical standard in severing the duct, proximately causing injury to Mrs. Williams; otherwise, if she had the congenital anomaly attributed to her by Dr. Bronwell, he met the medical standard and, thereby, is not legally responsible for the results of his operation.

The doctor did testify he became aware at the second operation that the common duct was in an abnormal location, and no other expert medical witness disputed the testimony; yet, the testimony is contradict-

---

**3.** The function of a counterpoint is to reply to an appellant's point of error; a cross-point should be used by an appellee to assert error in some ruling by or action of the trial court. *Jackson v. Ewton*, 411 S.W.2d 715, 717 (Tex. 1967).

**4.** The "same school" rule has its exceptions. *See, e. g., Porter v. Puryear*, 153 Tex. 82, 262 S.W.2d 933 (1953).

ed by and inconsistent with the doctor's sensory observations of, and his own written report recording, the normalcy of the common duct in the first operation, at which time the doctor was persuaded the duct had not been injured. Harmonious with the doctor's trial testimony of the abnormal position of the common duct is that portion of his written report of his second operation, dictated within minutes after surgery, which did record the abnormality; however, that report states a diagnosis which the doctor conceded was incorrect, and in the same sentence which records the abnormality, the doctor declared that the duct "had been *inadvertently* removed (emphasis added)." "Inadvertently" carries the accepted meaning of "heedlessly," "inattentatively," "negligently." *See* Webster's New International Dictionary (2d ed.). The doctor's characterization of the removal is consistent with his statement, related by Mrs. Williams, "that he had goofed." In this connection, the extrajudicial admissions of the defendant doctor have the same legal competency as direct expert testimony in establishing the plaintiff's cause, provided the doctor's statements constitute an admission of negligence. 70 C.J.S. *Physicians and Surgeons* § 62d(2).

The conflict of normality vis-a-vis abnormality is not dispelled by other expert medical evidence and it is impossible to do so because, in Dr. Bronwell's second operation, all anatomical landmarks were destroyed. Moreover, the conflict is magnified by the internal incongruence in Dr. Bronwell's written reports; by the incompatibility between the doctor's second-operation written report of the abnormality and his testimonial declarations, made at least twice, that he had not made a written report of the abnormality; by the contradictions in the testimony of the first post-operation conversation; and by the inconsistencies revealed by Dr. Bronwell's deposition and trial testimony concerning what discussions, if any, he had with his medical colleagues and, if so, with whom.

In brief, there is expert medical evidence of both a normal and an abnormal location of Mrs. Williams' common duct. Thus, in

the final analysis, the condition of her anatomy must turn on the credibility of Dr. Bronwell. The doctor was an interested party through whom evidence of both the normal and abnormal location of the common duct was adduced, and his trial testimony of the anomaly could not be contradicted by other medical experts if it was untrue. In these circumstances, the evidence presents the issue for the jury's determination. *James T. Taylor, etc. v. Arlington Ind. School Dist.*, 160 Tex. 617, 335 S.W.2d 371, 376 (1960). Because portions of the evidence adduced from and through Dr. Bronwell contradict other portions of his evidence, conclusive effect cannot be given to any contradictory portion of it to establish the normality or abnormality of Mrs. Williams' anatomy. Again in these circumstances, a fact issue was created for the jury's resolution. *Robinson v. Ashner*, 364 S.W.2d 223, 226 (Tex.1963). This is especially true because reasonable minds could differ as to the inferences to be drawn from the doctor's evidence, even though he has attempted to declare his position upon the ultimate issue. 3 R. McDonald, Texas Civil Practice § 11.28.6 (1970).

Consequently, only the jury could determine the true condition of Mrs. Williams' anatomy and, being advised of the medical standard by a medical expert, the jury was the only fact finder to determine whether Dr. Bronwell's actions constituted negligence or malpractice. *Snow v. Bond*, 438 S.W.2d 549, 550–51 (Tex.1969). Given some evidence of probative nature raising the issues of negligence and proximate cause, the issues were required to be submitted to the jury. *Air Conditioning v. Harrison-Wilson-Pearson*, 151 Tex. 635, 253 S.W.2d 422, 425 (1952). We have considered the quantum and quality of the evidence, the summary of which has been set out above, under the principles of review enunciated in *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). Having done so, we conclude and find that the evidence is both legally and factually sufficient to support the jury findings of negligence and causation.

By his last point, Dr. Bronwell alleges the court prejudicially erred in refusing to give his requested instructions advising the jury, among other information, that "negligence and proximate cause can only be established by expert medical witnesses." His argument is not supported by any authority sanctioning the specific jury instruction, and understandably so. The proposed instruction is an incorrect statement of the law. What constitutes negligence or malpractice is a mixed question of law and fact for determination by the trier of fact, and a medical expert is not competent to express an opinion thereon. *Snow v. Bond, supra,* at 550–51. Furthermore, in this light, such an instruction would violate the command in Rule 277 of the Texas Rules of Civil Procedure that the trial court, in giving an instruction, shall not comment directly on the weight of the evidence.

Mrs. Williams did not secure the submission of an issue to determine the reasonable and necessary amount of her medical expenses. By a counterpoint, which is adequately developed for consideration as a cross-point, she contends that she established medical expenses of $26,000 as a matter of law. We disagree.

Mrs. Williams testified that her medical expenses are more than $26,000. Then, Dr. Bronwell was questioned about "the charges that have been made to her in excess of $25,000" as being "reasonable and necessary in an effort to heal her condition." First disclaiming any knowledge in the field of the reasonableness of medical charges, the doctor, when pressed, said the charges sound reasonable to him. When asked if the treatment Mrs. Williams received has been necessary, Dr. Bronwell replied, "She has been in good hands."

Notwithstanding that medical charges have been made to Mrs. Williams, she was entitled to recover only those medical expenses which were reasonably and necessarily incurred as the result of the operation. *Kulms v. Jenkins,* 557 S.W.2d 149, 154 (Tex.Civ.App.—Amarillo 1977, writ ref'd n. r. e.). The testimony on the subjects is without the specificity of reasonableness or necessity required to conclusively establish a reasonable and necessary amount of medical expenses. Obviously, there is no specification of necessity for charges totaling $26,000, and the testimony showing only the nature of the injuries, the character and need for services rendered, and the amounts charged therefor does not constitute evidence of a probative nature that the charges were reasonable. *Dallas Railway & Terminal Company v. Gossett,* 156 Tex. 252, 294 S.W.2d 377, 383 (1956).

The judgment is affirmed.

DODSON, J., dissents with opinion.

DODSON, Justice, dissenting.

I respectfully dissent.

The trial court submitted this case upon three special issues. The first issue inquired of the jury whether Dr. Bronwell "failed to exercise ordinary care when he cut the common bile duct of the Plaintiff, Vivian Williams." Ordinary care was defined in the charge as "that degree of care which a medical surgeon of ordinary prudence, engaged in the practice of medicine in Lubbock County, Texas, would use under the same or similar circumstances." The jury answered "we do" to this issue.

By points of error one through four, Dr. Bronwell challenges the court's submission of the first issue. These four points are predicated upon the trial court's failure to grant his motions for a directed verdict, his motion for judgment notwithstanding the jury's verdict, and the absence of probative evidence to support the submission of special issue number one. By these four points he, in essence, maintains that there is no evidence of probative force to support the submission of the first special issue to the jury. I agree.

The evidence shows that on May 24, 1973, Dr. Bronwell performed a cholecystectomy on Mrs. Williams. The doctor testified, *inter alia,* that at the time of this surgery, he thought Mrs. Williams had a normal common bile duct. Several days after the first operation, a mass appeared in Mrs. Williams' stomach. Shortly thereafter, he

again operated on Mrs. Williams and found two quarts of bile accumulated in the peritoneal cavity. After an intensive search for the origin of the bile, he discovered that Mrs. Williams' common bile duct led to and drained into the gall bladder rather than the duodenum. He described this condition as a congenital anomaly.

At the trial, Dr. Bronwell gave the only medical testimony concerning the standard of care for a physician to exercise when performing a cholecystectomy. Upon cross examination he testified as follows:

Q. It is, of course, of critical importance surgically that the surgeon avoid cutting it, [the common bile duct] isn't that true?

A. It's very important that the surgeon should not sever the common bile duct and this is especially easy to follow in normal anatomy.

Q. So when we say sever we're talking about cutting into the common bile duct?

A. Well, you might cut into it for various reasons, diagnostic reasons.

Q. But the medical schools teach that you are not supposed to cut into or sever the common duct when you are removing a gall bladder, that's true, isn't it?

A. If it is normal. Mrs. Williams' was not normal.

Q. We'll get to that but I'm talking about what you were taught.

A. When the common duct was normal, when you identified the cystic duct, enter into it, I was taught that you would not enter the common bile duct and in thousands of cases this has been true but not in her case.

Q. So now, going back we're talking about the medicine that you studied and the medicine for that matter is applied in this area and the surgical standards in this area. Doctors are taught and surgeons practiced in this area back in May of 1973 that when the gall bladder is removed the surgeon is not to cut into— by that I mean not to snip or cut apart the common duct, isn't he?

A. If the common duct—in normal anatomy the surgeon is taught not to cut it.

From the doctor's testimony emerges the standard of care that when a physician performs a cholecystectomy upon a person who has an anatomically normal common bile duct, then a reasonably prudent physician does not sever the common bile duct.

The evidence shows that an anatomically normal common bile duct extends from the left and right hepatic ducts to the duodenum, is in a vertical position and is approximately three to four inches long. The gall bladder is partially embedded into the liver. The cystic duct extends from the neck of the gall bladder to the common duct. The cystic duct and the common duct join to form a tee, i. e., y-shaped (y) configuration.

The liver secretes approximately two pints of bile each day. In a person with normal anatomy, bile secreted from the liver drains or passes through the common duct into the duodenum. A portion of the bile is stored in the gall bladder. Bile from the common duct passes to and from the gall bladder through the cystic duct.

In describing the congenital anomaly found in Mrs. Williams, the doctor testified that the common duct was embedded into the liver and led to and drained directly into the gall bladder rather than the duodenum; and that the elongated cystic duct extended from the gall bladder to the duodenum rather than to a normal common duct. In this anomaly, the liver bile secreted from the liver drained into the gall bladder and then passed directly into the duodenum through the elongated cystic duct. In essence, the doctor stated that Mrs. Williams' common duct did not extend to the duodenum, was not in the usual vertical position and did not connect to or join with the cystic duct.

The doctor stated that the congenital anomaly was rare; that he had never seen the anomaly in anyone other than Mrs. Williams; that when such an anomaly is present, it is impossible for the surgeon to remove the diseased gall bladder without severing the attached common duct; and

that when the anomaly is recognized, the diseased gall bladder still must be removed and a connection made between the common duct and the duodenum. This connection is usually made from a portion of the small intestines. In this regard, I point out that Mrs. Williams did not plead, pursue, and does not now contend that Dr. Bronwell negligently failed to recognize or discover the claimed anomaly when he performed the cholecystectomy or that he negligently failed to connect the severed common duct to the duodenum. Thus, these matters do not form a part of her theory of negligence and this court should not deem any of these matters as found in support of the judgment. Tex.R.Civ.P. 279.

In medical malpractice actions, as in other negligence cases, the plaintiff has the burden of establishing each of the three essential elements of actionable negligence. *See Hood v. Phillips*, 554 S.W.2d 160, 165 (Tex.1977); *Constant v. Howe*, 436 S.W.2d 115, 120 (Tex.1968); *Bowles v. Bourdon*, 148 Tex. 1, 219 S.W.2d 779, 782 (Tex.1949). The elements are a legal duty owed by one person to another, a breach of that duty and damages proximately resulting from such breach. *See, e. g., Frontier Theatres Inc. v. Brown*, 362 S.W.2d 360, 369 (Tex.Civ. App.—El Paso 1962), *rev'd on other grounds*, 369 S.W.2d 299 (1963); *White v. Jackson*, 358 S.W.2d 174, 177 (Tex.Civ.App. —Waco 1962, writ ref'd n.r.e.); *Skillern & Sons, Inc. v. Paxton*, 293 S.W.2d 521, 524 (Tex.Civ.App.—Eastland 1956, writ ref'd n.r.e.). Simply stated negligence is a failure to observe a legal duty. *McKinney v. Chambers*, 347 S.W.2d 30, 31 (Tex.Civ.App. —Texarkana 1961, no writ). Moreover, for there to be negligence with respect to a particular person, then there must be a violation of a legal duty to that very person. *See, e. g., Webb v. City of Lubbock*, 380 S.W.2d 135, 136 (Tex.Civ.App.—Amarillo 1964, writ ref'd n.r.e.); *Frontier Theatres Inc. v. Brown, supra*, at 367; *J. E. Stevens Funeral Home v. Busby*, 336 S.W.2d 812, 813 (Tex.Civ.App.—Eastland 1960, no writ). The existence of a legal duty under a given state of facts and circumstances is essentially a question of law for the court. *Jack-*

*son v. Associated Developers of Lubbock*, 581 S.W.2d 208, 212 (Tex.Civ.App.—Amarillo 1979, writ ref'd n.r.e.); *Frontier Theatres Inc. v. Brown, supra*, at 369.

In the case before us, the first element of actionable negligence, *i. e.*, legal duty, emerges from Dr. Bronwell's testimony concerning the standard of care to be exercised by a surgeon performing a cholecystectomy. The standard of care is that a reasonably prudent surgeon does not sever the common duct when performing a cholecystectomy upon a person who has an anatomically normal common duct. Under this standard, no legal duty exists unless the person has an anatomically normal common duct. Thus, to support the submission of special issue number one, *i. e.*, the negligence issue, Mrs. Williams has the burden of introducing evidence of probative force which serves to prove that she had an anatomically normal common duct when Dr. Bronwell performed the cholecystectomy. *See Constant v. Howe*, 436 S.W.2d 115, 120 (Tex.1968); *Smith v. Guthrie*, 557 S.W.2d 163, 165 (Tex. Civ.App.—Fort Worth 1977, writ ref'd n.r. e.).

In determining the legal sufficiency of the evidence to support the submission of the negligence issue, we must review the evidence and all reasonable inferences therefrom in the light most favorable for the submission of the issue and disregard any evidence contrary thereto. Nevertheless, there must be evidence of probative force to support the submission of the issue. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059, 1063 (1898). Probative evidence must serve to prove the asserted proposition and it must be more than a surmise or suspicion. In *Joske v. Irvine, supra*, 44 S.W. at 1063, the court stated:

From a careful examination of the cases, it appears (1) that it is the duty of the court to instruct a verdict, though there be *slight testimony*, if its probative force be so weak that it only raises *a mere surmise or suspicion* of the existence of the fact sought to be established,

such testimony, in legal contemplation, falling short of being "any evidence"; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force (emphasis added).

By definition, a surmise is a "thought or idea based on scanty evidence", "a guess", "conjecture", or "to infer on slight grounds". Webster's New International Dictionary 2538 (2d ed. 1939).

To establish that she had an anatomically normal common bile duct when Dr. Bronwell performed the surgery, Mrs. Williams relies on a phrase taken from the doctor's post-operative report that the "common duct was normal to palpation." The report is as follows:

A right subcostal incision was made, and upon opening the abdomen, exploration revealed the gall bladder contained multiple stones, and walls were thickened, common duct was normal to palpation. The head of the pancrease [sic] was normal, soft and pliable and common duct was not explored. The uterus was several times normal size and contained multiple fibromyomatous tumors. The gallbladder was removed, by dissecting free the cystic duct and artery and clamping and dividing and ligating them separately and gallbladder was removed by sharp dissection and the bed was closed with running sutures of # 0 chromic catgut. Two large rubber tissue drains were brought through a stab wound in the right lateral abdominal wall and placed in the region of the foramen of Winslow and right gutter. The wound was closed in layers, with peritoneum closed with running sutures of # 0 dexon and fascia with interrupted 2–0 mersilene, and retention sutures of 2–0 dermalon and skin with interrupted 4–0 mersilene (emphasis added).

Portions of the doctor's testimony place the report in proper context. A pertinent part of his testimony stated on cross examination is as follows:

Q. All right. So you said the common duct was normal to palpation, didn't you? [referring to the report].

A. I have explained that to them previously.

Q. But that is what you said, isn't it?

A. Yes, but I explained what I was feeling.

Q. And what you were telling the whole world in her medical records, the permanent part of her file, was that you felt of the common duct and it was normal, is that right?

A. What I said was that I had traced what I thought was the cystic duct down to where it joined with a duct. Once I identified that structure I then put my fingers in that space, which is called the foramen of Winslow and the porta hepatitis, palpated and the common duct is a tube structure that can only be felt if stones are present and that's what I said there.

Q. You told the whole world that when you felt of the common duct it was normal?

A. As to what I had thought was the common duct at that time.

The doctor had previously testified on cross examination, as follows:

Q. All right. Did you say anything at all about the common duct?

A. I made a notation that I palpated in the region of the common duct and found it to be normal and so that I might explain that to the Jury, the common bile duct is a duct that ordinarily runs between the liver and the intestine. It is a tube, it has no consistency and it runs in a sheath with two other structures, one being an artery and one being a vein. It is of importance surgically because we feel it and if there are no stones in it, we say it is normal (emphasis added).

On direct examination, Dr. Bronwell testified as follows:

Q. All right. Now, Doctor, when you performed the surgery on Mrs. Williams I believe it was on May 24th, 1973. I would like for you to tell us just exactly what you did from the time you made the first incision on down to the end of the

surgery, please? [The question refers to the cholecystectomy].

A. We made the—it was alluded to yesterday by Mr. Burnett. We made a subcostal incision, which is an incision underneath the ribs, we opened the peritoneal cavity and the first thing we did was to check the gall bladder and found its walls to be thickened and to contain the stones that we previously mentioned. We looked at the liver and found it to be of normal consistency. We reached down into an area that we call the foramen of Winslow or the porta hepatis and felt along the porta hepatis, which we anticipate would have three structures, the portal vein, the hepatic artery and the common bile duct. *As I have testified before, we were feeling for evidence of stones in this area and not feeling any, we considered it to be normal.* We then explored the remainder of her abdomen and ascertained, as I have mentioned before, that she had some fibrous tumors of the uterus but they were—(emphasis added).

On further direct examination, he reiterated his testimony as follows:

Q. Now, when you testified, I believe, that when you went down and examined the duct structure, that you palpated the common duct, in your report?

A. Yes.

Q. Tell us—tell the Court and Jury what you palpated and how you go about it.

A. It would be easiest for me to speak from here. We know the common bile duct—under normal conditions the common bile duct, the porta vein and the hepatic artery, that's the artery to the liver, run in this band called the porta hepatis. This opening here is a true opening and empties into a cavity here, it's called the foramen of Winslow or the epiploic foramen. *Now, as I testified before, when you palpate a common duct, you are palpating for a hard object because the common duct is a soft object. So we use the term, rightly or wrongly, when we stick our finger in there and*

*feel all the way up into this point here that we have palpated the common duct and if we don't feel any stones, we say the common duct is normal. Probably that could be said better but that has been an accepted statement for years and that's the way I was taught originally* (emphasis added).

From the above testimony, the doctor, in essence, stated that he located the cystic duct; that the cystic duct connected with a duct which he thought to be the common duct; that the common duct can only be felt if it contains stones; that he felt for stones in the area of the duct which he thought to be the common duct; that he found no stones; and that having found no stones he thought the common duct was normal. When the phrase and the above evidence are viewed in the light most favorable to Mrs. Williams the evidence conveys no more than a thought or idea that she had an anatomically normal common duct. Therefore, I conclude that the statement does not serve to prove Mrs. Williams' asserted position.

Mrs. Williams further says the judgment is supported by other evidence of probative force because a few hours after the second operation the doctor told her "that he goofed." The doctor denied making the statement. Mrs. Williams' testimony is, as follows:

Q. After the nurse had left the room I want you to tell the Jury of the conversation that took place between you and Dr. Bronwell, just tell the jury.

A. Well, Dr. Bronwell sat on the right inside of my bed, as lots of times he did, and he told me that I was right, *that he had goofed.* He took the envelope in which I had received a letter from my aunt and he drew out to me—he said that the common duct had been cut and that he had made this certain arrangement and he felt that I could live a normal life with that arrangement. He drew out and I could sketch for you what he sketched for me, that's—but he drew out what he had done to repair or try to repair the damage (emphasis added).

The testimony leaves to speculation and surmise the essential queries of how, when and in what manner did the doctor "goof." Under these speculative circumstances, I conclude that the statement does not serve to prove that Mrs. Williams has an anatomically normal common duct. Moreover, assuming arguendo that the statement was made, then the most likely guess as to what the doctor intended to import is that he goofed by not discovering the anomaly during the first operation and by not making the necessary repair at that time. Admittedly, this surmise is speculative when viewed in context with other testimony in the record concerning the rarity of the alleged anomaly. Nevertheless, as is pointed out above, Mrs. Williams does not plead or pursue these other alternate theories of negligence.

Throughout the trial Mrs. Williams claimed that the doctor fabricated the anomaly to excuse and cover-up his negligence in severing her normal common duct. Her challenge was primarily grounded on the assertion that the doctor did not report the anomaly to the world, the medical community or anyone else in particular. Yet, as pointed out in the majority opinion, the anomaly was noted in the doctor's post-operative report of the second surgery. The report states in part, as follows:

An upper midline incision was made and upon opening the abdomen examination showed an extensive biliary peritonitis. This was drained of several thousand cc. of bile containing fluid. *Further examination showed that there is marked inflammatory reaction of the region of the common bile and the porta hepatis and it was noted that at the time of the previous operation the patient had an abnormality in which the common bile duct was a part of the gallbladder which had been inadvertently removed.* The hilus of the liver was dissected free until a duct was encountered. At this point a catheter was inserted into the duct and a cholecholangiogram was taken indicating that there was no distal common bile duct. The duct was then enlarged and the jejunum was divided. The distal end was closed with end to side anastomosis was completed between the common bile duct and the remaining common bile duct and the functional loop of jejunum. The jejunum, or rather this was completed with an interrupted 4–0 Mersilene suture to the mucosa. This had been completed and the jejunum was reanastomosed to the lower segment of jejunum which was essentially 18 inches below the divided portion. When anastomosis was completed there was no tension whatsoever (emphasis added).

I am persuaded that the word "inadvertently" must be viewed in context with the remaining portions of the sentence. When viewed in this light, the sentence serves to prove the opposite from Mrs. Williams' asserted position. Obviously, she ignores the sentence in the report with good cause. The sentence does not support her theory of negligence.

The word "inadvertently" as used in the report is not an extra judicial admission of actionable negligence. By using the word "inadvertently" in the sentence, the doctor states that when removing the gall bladder he unknowingly removed the common duct which was abnormally attached to the gall bladder. Assuming arguendo that the word is an extrajudicial admission, then its probative value must be weighed as any other evidence. I conclude that the word "inadvertently" as used in the report does not serve to prove that Mrs. Williams had an anatomically normal common duct and it is not probative evidence to support the submission of special issue number one.

Furthermore, assuming arguendo that "inadvertently" as used in the report is an extrajudicial admission of negligence, as found by the majority, then it relates to independent grounds of recovery which are not pleaded or pursued by Mrs. Williams. As pointed out above, she did not plead, pursue and does not contend in the court that the doctor negligently failed to recognize, discover or connect the severed common bile duct. These matters are independent grounds of recovery. Rule 279 of the

Texas Rules of Civil Procedure provides, in part that: "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and upon which no issue is given or requested shall be deemed as waived." Nevertheless, the majority has determined that the word "inadvertently" as used in the report is an extrajudicial admission of negligence and has found such negligence in support of the judgment. For the reasons stated, I disagree with the majority. Accordingly, I conclude the word "inadvertently" is not an extrajudicial admission of actionable negligence, does not support the submission of special issue number one, and does not support the judgment.

In summary, Mrs. Williams' theory of the case is that when Dr. Bronwell performed the cholecystectomy upon her, she had an anatomically normal common duct; that a reasonably prudent surgeon does not sever the common duct when he performs a cholecystectomy; that Dr. Bronwell admitted severing the common duct; that he fabricated a rare congenital anomaly to excuse his negligence; that he destroyed the evidence of his negligence in the second operation; that the anomaly did not exist because he failed to report the claimed rare anomaly to the world, the medical community or anyone else in particular; that he admitted negligence by telling her "that he goofed"; and that the phrase "common duct normal to palpation" proves that she had an anatomically normal common duct and disproves the claimed congenital anomaly. Thus, by disproving the congenital anomaly, he proved the opposite, i. e., an anatomically normal common duct.

By her theory of the case, Mrs. Williams implied that Dr. Bronwell negligently and knowingly left the severed common duct dangling in her body indiscriminately profusing bile with his further knowledge of the eventual and predictable future dire results. Parenthetically, knowledge of the severed common duct is imputed to him because of his inability to remove the cystic duct from the body without detaching the remaining portion of the common duct. The evidence shows that in normal anatomy the cystic duct and the common duct join to form a tee, i. e., y-shaped (y) configuration. The common duct is in the vertical position and the cystic duct connects to the common duct in the horizontal position. If the common duct is severed above or below the point where the cystic duct is connected to it, then to remove the cystic duct, it must be detached from the remaining portion of the common duct. Her implication is inferred although the unchallenged medical evidence shows that the common duct is easy to reconnect in this described situation.

In the absence of any probative evidence to show that Mrs. Williams had an anatomically normal common bile duct when Dr. Bronwell performed the cholecystectomy, I am unwilling to disregard the legal implications of Mrs. Williams' theory of negligence and say that the negligence issue is for the jury. When the physician's liability is not predicated upon a breach of a legal duty, than he becomes an absolute insurer against any unfortunate or harmful results. *See Hood v. Phillips,* 554 S.W.2d 160, 165 (Tex. 1977); *Louis v. Parchman,* 493 S.W.2d 310, 317 (Tex.Civ.App.—Fort Worth 1973, writ ref'd n.r.e.); *Goodnight v. Phillips,* 458 S.W.2d 196, 202 (Tex.Civ.App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.); *Frontier Theatres Inc. v. Brown,* 362 S.W.2d 360, 367 (Tex.Civ.App.—El Paso 1962), *rev'd on other grounds,* 369 S.W.2d 299 (1963). Under the standard of care established by the medical evidence in this case, Mrs. Williams has the burden of introducing evidence of probative force to support the submission of special issue number one in order to defeat Dr. Bronwell's *motions for instructed verdict and motion for judgment N.O.V.* The difficulty of her task does not relieve her of the burden.

The evidence shows that Dr. Bronwell was assisted in both operations by Dr. Culp. At the time, Dr. Culp was Mrs. Williams' family physician. An anesthesiologist was present at both operations. A pathologist examined the tissue removed at the first operation. Neither party offered testimony from these individuals. Mrs. Williams has the burden of establishing actionable negli-

gence. I am not persuaded that Dr. Bronwell was her only source of evidence on the normal versus anomaly question. Therefore, I am persuaded that she failed to carry her burden.

I conclude that there is no evidence of probative force to support the submission of special issue number one, and that the trial court erred in refusing to grant Dr. Bronwell's motions for an instructed verdict and his motion for judgment N.O.V. I would sustain Dr. Bronwell's points of error one through four, reverse the judgment of the trial court and render judgment that Mrs. Williams take nothing on her action against Dr. Bronwell. Accordingly, I respectfully dissent.