James BAUER, M.D., and Victoria Radiological Associates, Appellants,

v.

Estle L. KING, Appellee.

No. 13–83–283–CV.

Court of Appeals of Texas, Corpus Christi.

May 24, 1984.

Rehearing Denied June 21, 1984.

Guy Allison, Corpus Christi, for appellants.

Alfred W. Ellis, Woodruff & Ellis, Dallas, for appellee.

Before NYE, C.J., and YOUNG and UTTER, JJ.

## OPINION

NYE, Chief Justice.

This is a medical malpractice case. Appellee, Estle King, brought suit against Dr. James Bauer and Victoria Radiological Associates, claiming negligence on Bauer's part in administering radiation therapy to her after surgery was performed to remove the lower left lobe of her lung. Trial was to a jury which found appellant negligent and awarded Mrs. King damages. The trial court entered judgment for King, plus prejudgment interest at a rate of six percent and post-judgment interest at the legal rate. Dr. Bauer appeals this judgment.

■■■ Appellant asserts five points of error on appeal. First, he claims that the trial court erred in awarding prejudgment interest from April 6, 1978 to May 23, 1983. Prejudgment interest is that interest calculated on a sum payable from the time of a loss or injury to the time of judgment. *Republic National Bank of Dallas v. Northwest National Bank of Fort Worth,* 578 S.W.2d 109 (Tex.1979). It is the general rule in Texas that prejudgment interest cannot be allowed *eo nomine* unless provided for by contract or statute. *Roylex, Inc. v. Langson Bros. Construction Co.,*

585 S.W.2d 768 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). One who seeks to recover prejudgment interest as damages must ask for it specifically or include it in the aggregate amount sought. *J.M. Hollis Construction Co. v. Paul Durham Co.*, 641 S.W.2d 354 (Tex.App.—Corpus Christi 1982, no writ); *Gulf States Paint Co. v. Kornblee Co.*, 390 S.W.2d 356 (Tex.Civ.App.—Texarkana 1965, writ ref'd, n.r.e.).

 Prejudgment interest is recoverable as a matter of right where an ascertainable sum of money is determined to have been due and payable at a *date certain prior to judgment. Republican Nat'l Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d at 116; *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480 (Tex.1978). The damages pleaded and determined by the jury in this case were not ascertainable and determined to have been due and payable prior to the judgment being rendered. As such, they were improperly awarded by the trial court. Appellants' first point of error is sustained.

In appellants' second and third points of error, they allege that the trial court erred in overruling their motion for judgment Non Obstante Veredicto and entering judgment for appellee because there was no evidence or, alternatively, insufficient evidence upon which the jury could find that the doctor was negligent in the treatment of Mrs. King.

In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well established test set forth in *Glover v. Texas General Indemnity Company*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Company v. Garza*, 626 S.W.2d 120 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); CALVERT, *No Evidence and Insufficient Evidence Points of Error*, 38 Tex.L.Rev. 361 (1960). We will review the facts of the case with these standards in mind.

In 1978, appellee was hospitalized, and the lower left lobe of her lung was removed. Dr. Dee Williams diagnosed her condition as cancer and determined that one of thirty lymph nodes which were removed at the time of her lung surgery was also found to be malignant. Thereafter, appellee underwent radiation therapy as a precautionary measure to ensure that no microscopic cancer cells remained in her body. This therapy was administered under the direction of Dr. Bauer, the appellant herein. Appellee later developed radiation myelopathy and complete paralysis of her lower body. She contends that the paralysis was proximately caused by the negligent treatment she received from Dr. Bauer. Radiation myelopathy is the degeneration of the spinal column secondary to the effects of exposure to radiation.

The record shows that Mrs. King began radiation treatments on February 27, 1978. She was involved in a "split course" treatment. This type of treatment involves the patient receiving radiation treatment each day for a number of days, followed by a rest period of a certain number of days, and then the resumption of treatments for another period of time. Dr. Bauer testified that Mrs. King suffered from "broncho-alveolar" carcinoma, which he described as an unusual sub-type of lung cancer. The radiation treatment he prescribed was designed to kill any residual cancer cells. For her first treatment, she received 250 RADS.[1] Thereafter, she received 300 RADS for three days. The second week, she had a treatment of 300 RADS each day for five days. She then had a break from March 11, 1982 through March 27, 1982. On March 27, 28, 29 and 30, she received an additional 300 RADS per treatment; and on April 3rd through the 6th, she received 300 RADS each day. The last three treatments that she received were rotational arc-type treatments. The total dose Mrs. King re-

---

1. The units of measurement used to determine the amount of radiation one receives are known by the profession as RADS.

ceived was 5,398 RADS. Dr. Bauer claimed that the total exposure to the spinal cord was about 4,650 RADS. At an earlier point, Dr. Bauer calculated the exposure to the spinal cord to have been 4,848 RADS.

■ The burden of proof in a medical malpractice case is on the patient to prove that the physician has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have taken under the same or similar circumstances. *Hood v. Phillips*, 554 S.W.2d 160 (Tex.1977). Expert testimony is required to meet this burden of proof. The medical standard of care must be established so that the fact finder (in this case, a jury) may determine whether the doctor's acts or omissions deviated from the standard of care as to constitute negligence. *Smith v. Guthrie*, 557 S.W.2d 163 (Tex.Civ.App.—Fort Worth 1977, writ ref'd n.r.e.).

■ An expert witness in a medical malpractice case should first state what the standard of care for a specific treatment is and then state the facts which show what the defendant doctor did. *See Coan v. Winters*, 646 S.W.2d 655 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.). The jury can then determine whether the defendant doctor met the standard of care. *Burks v. Meredith*, 546 S.W.2d 366 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.).

■ Here, appellee introduced the deposition testimony of Dr. Joe Rector, Director of Radiation Therapy at St. Luke's Hospital in Kansas City, Missouri. He testified that he had never examined the appellee, Mrs. King, but had read the records concerning her case. Dr. Rector claimed that development of radiation myelopathy was not a common consequence of radiation therapy following surgery. He said that the development of this condition depended upon the field size and dosage and a number of other things. Dr. Rector indicated that he

normally did not notify his patients of the risk of "cord problems" unless, in an unusual circumstance, a very large field size was utilized.[2] He described the breaking point between a small port as about 10 by 10 centimeters. The port used in the case at bar was 10 by 12 centimeters. He testified that the rule of thumb that almost everyone around the country uses in determining the dosage amount is about 1,000 RADS per week divided into five treatments of 200 RADS per day over a period of time until one reaches the dose that the patient is to receive. Dr. Rector testified that 300 RADS per day was more than the usual or standard dosage used around the country with the exception that, when treating oat cell cancer, it is not unusual to give 300 RADS a day to a total dose of 3,000 RADS in a two-week period. Mrs. King suffered from a type of cancer other than oat cell cancer. He was asked whether 300 RADS a day would be more than usual for the type of cancer which Mrs. King had, and he responded that "it's not the way I would fractionate the dose if I was treating her." He testified that the total dosage she received was not too much in general, but that it was too much for her. According to Dr. Rector, there is an individual variation in tolerance to radiation susceptibility.

Dr. Hubert Rodney Withers, a physician specializing in radiation oncology, also testified by deposition. He testified that Mrs. King was treated in a fairly standard fashion, receiving a dose of about 4,500 RADS, with a boost dose of about one thousand RADS. He said that the total amount of radiation that the spinal cord can safely receive is between 4,500 and 5,000 RADS. Dr. Withers indicated that the effectiveness of the total dose depends on the size of the dose per fraction in which it is delivered. He said the common dose per fraction is about 200 RADS. It was Withers' opinion that Mrs. King's radiation myelopathy was caused by the larger doses she received in each fraction. According to

---

**2.** Field size is the area the radiation beam is treating or affecting. The term "port" also means field size.

Withers, there is an increased hazard of radiation myelopathy when a larger dose of more than 200 RADS in each fraction is used. Dr. Withers also testified that a common dose of radiation would be for a doctor to administer 3,000 RADS in ten fractions of 300 RADS each. He further testified that he felt the basic problem with regard to Mrs. King's development of radiation myelopathy was that 4,500 to 5,000 RADS was given in 300–RAD fractions, which is substantially more effective than the same dose given in 200–RAD fractions with regard to both its effect on the cancer and the spinal cord. According to Withers, Mrs. King's treatment differed from the usual split course treatment regimen in that, in most cases, they exclude the spinal cord from the treatment during the second half. In Mrs. King's treatment, the spinal cord was not excluded during one week of the second course of treatment.

Dr. Vincent Collins, a medical doctor specializing in radiotherapy, also testified. Dr. Collins testified that the "intermediate person" will carry "his radiation dosage as far as he thinks he can." He claimed that, if a doctor does not go far enough to kill the cancer, there is not much point in performing the treatment. He indicated that he believed the regime followed by Dr. Bauer was in accordance with the general standard. He further testified that he believed Dr. Bauer took the additional precaution to adjust one treatment method in the final few treatments to spare the spinal cord, by directing the beam in another fashion. Dr. Collins said that, for individuals without problems, the 200 RADS per day treatment is acceptable. But often, for the patient's convenience or for one reason or another, the schedule may be altered. He further testified that 300 RADS per day would increase the risk of injury to the spinal cord if carried out without interruption. Mrs. King's treatment, however, was interrupted. He also disagreed with Dr. Rector's testimony that a field of 10 by 12 centimeters was considered a large field. Collins agreed that there is a relationship between the development of symptoms of myelopathy to total dose, time and number of fractions in which the radiation is given.

The burden of proof was upon Mrs. King to establish that Dr. Bauer undertook a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances. There is evidence, through the testimony of Dr. Rector and Dr. Withers, that the common dose per fraction is *"about 200 RADS."* Dr. Rector testified that, as a rule of thumb in regard to the administration of radiation therapy, the standard was 1,000 RADS per week with five treatments per week at 200 RADS per treatment. Most of Mrs. King's treatments constituted 300 RADS each.

Through the testimony of Doctors Rector and Withers, appellee did establish a general standard that physicians in the field of radiology use in determining the proper dosage that a patient is to receive when undergoing radiation therapy. We believe that she met her burden of showing a standard of care utilized by radiologists in treating their patients.

However, after considering all of the testimony of the medical experts, we find that there was no evidence for the jury to have found that Dr. Bauer fell below that standard. All of the medical experts agreed that 200 RADS per dose was a common manner to fractionate when treating a patient with radiation. On the other hand, there was no testimony that 300 RAD dosages, as such, fell below or violated the standard of care. In fact, Dr. Withers testified that a common dose of radiation would be to administer 3,000 RADS in ten fractions of 300 RADS each. While there was evidence that increased dosages per fraction increased the risk of myelopathy to a degree, there is no evidence that a 300 RAD fractioning that Mrs. King received was either an *unaccepted* mode of treatment or a form of treatment which was not supported by medical evidence. At most, Mrs. King produced some evidence through Dr. Rector's testimony to the effect that he personally would not have given Mrs. King

the same dosages as Dr. Bauer had given her. However, this evidence does not show a breach of the standard of care which a reasonable and prudent member of the medical profession would have taken under the same or similar circumstances. All of the medical experts testified that the total dosage received by Mrs. King was *"within normal limits."* The appellee introduced evidence to show the standard of care exercised by the medical profession, but failed to introduce evidence showing that Dr. Bauer deviated from that standard in such a way as to be negligent. We hold that there was no evidence upon which the jury could have found that Dr. Bauer was negligent in his treatment of Mrs. King. Appellant's second point of error is sustained.

In points of error four and five, appellants assert that the trial court erred in overruling defendant's motion for judgment Non Obstante Veredicto because there was no evidence, or alternatively, insufficient evidence upon which the jury could find that Dr. Bauer's treatment was a proximate cause of Mrs. King's injuries. Again, we will review all of the evidence according to the standard set forth herein above.

To establish proximate cause, the injury suffered must be a natural and probable result of the act or omission complained of. *State Highway Department v. Hinson*, 517 S.W.2d 308 (Tex.Civ.App.— Corpus Christi 1974, writ ref'd n.r.e.). With our disposition of appellant's second point of error in mind, we will review all of the evidence. Dr. Bauer testified that Mrs. King's paralysis was caused by the radiation treatment that she received. Dr. Joe Rector testified that appellee most probably had radiation myelopathy. Dr. Rodney Winters testified that, based upon reasonable medical probability, Mrs. King's myelopathy was caused by the larger amount of dosages that she received in each fraction. He further testified that larger dosages of radiation increase the hazards of radiation myelopathy and paralysis of the spinal cord. Dr. Ben McAllister testified that his "best diagnosis was that damage

done to Mrs. King was caused by the radiation therapy."

All the medical professionals agreed that Mrs. King was suffering from myelopathy, which was caused by the radiation therapy. These points of error on causation are overruled.

The judgment of the trial court is reversed, and judgment is here rendered that plaintiff appellee take nothing.